STATE EX REL. WARREN, Attorney General, Petitioner, v. NUSBAUM, Secretary of Administration, Respondent. [Case No. State 218.]

STATE EX REL. WISCONSIN HOUSING FINANCE AUTHORITY, Petitioner, v. NUSBAUM, Secretary of Administration and another, Respondents. [Case No. State 219.]

*Nos. State 218, 219. Argued May 2, 1973.—Decided June 29, 1973.*
(Also reported in 208 N. W. 2d 780.)

392

For the petitioner Robert W. Warren the cause was argued by *Steven M. Schur,* assistant attorney general, with whom on the brief was *Robert W. Warren,* in pro per, attorney general, and *Foley & Lardner,* attorneys for petitioner Wisconsin Housing Finance Authority, of Milwaukee, and *William J. Kiernan, James O. Huber* and *Richard D. George* of counsel, all of Milwaukee, and oral argument by *Mr. George* and *Mr. Huber.*

For the respondents there were briefs by *Quarles, Herriott, Clemons, Teschner & Noelke,* attorneys for respondent Blyth Eastman Dillon & Co., Inc., and *Laurence C. Hammond, Jr., Robert H. Diaz, Jr., W. Stuart Parsons* and *Stephen E. Richman* of counsel, all of Milwaukee; *Godfrey & Kahn, S. C.,* attorneys for respondent Joe E. Nusbaum, state secretary of administration,

and *Joseph M. Bernstein* and *George F. Roth* of counsel, all of Milwaukee; and oral argument by *Mr. Hammond* for respondent Blyth Eastman Dillon & Co., Inc., and *Mr. Bernstein* for respondent Joe E. Nusbaum.

CONNOR T. HANSEN, J. Petitioners seek a determination that the appropriation authorized by ch. 287, secs. 2, 3, Laws of 1971 (sec. 20.135, Stats.), is not in conflict with any provision of the constitution of the state of Wisconsin; that respondent-secretary may legally issue the requested voucher for the $250,000 appropriated to the Authority by ch. 287, sec. 2, 3, Laws of 1971; that the Authority is legally created and existing pursuant to ch. 287, Laws of 1971 (ch. 234, Stats.) ; that the provisions of ch. 287, Laws of 1971, are not in violation of any provision of the Wisconsin or United States Constitutions; that the bonds issued by the Authority are valid and enforceable obligations of the Authority; that the purposes to which the proceeds of the sale of bonds may be applied are lawful purposes; and that the Authority has fulfilled those conditions precedent upon which respondent, Blyth Eastman Dillon, has based its refusal to perform under its offer to purchase.

The Authority consists of the secretary of local affairs and development and six public members appointed by the governor by and with the advice and consent of the senate. At least one such public member shall be a person recommended by the commissioner of savings and loan, at least one shall be recommended by the commissioner of banking, and at least one shall be recommended by the executive director of the investment board. In addition, the chairman of the assembly committee on municipalities and the chairman of the senate committee on housing and urban development shall serve as ex-officio members of the Authority. A member of the Authority shall receive no compensation for his services but shall

be reimbursed for necessary expenses.[1] The Authority shall employ an executive director, legal and technical experts, and such other officers, agents and employees as it may require, and shall determine their qualifications, duties, and compensation. The Authority may delegate to its agents or employees any of its powers or duties.[2]

The general powers conferred upon the Authority by ch. 234, Stats., are enumerated in sec. 234.03. The Authority is empowered to employ all the powers "necessary or convenient" to implement the purposes of ch. 234 including the power to sue and be sued, the power to issue notes and bonds, the power to study, analyze and research housing needs within the state, and the power to disseminate the results to the public and to inform the governor and legislature. The Authority may encourage research and demonstrate techniques and methods for increasing the supply of housing; may cooperate with other governmental agencies, sponsors and local authorities; may encourage community organizations to assist in initiating housing projects; and may provide technical assistance in the development of such projects. Sec. 234.03 further provides that the Authority shall have the power:

"(11) To collect fees and charges on mortgage loans for the purpose of paying all or a portion of authority costs as the authority determines are reasonable and as approved by the authority.

"(12) To set standards for housing projects which receive loans under this chapter and to provide for inspections to determine compliance with such standards.

"(13) To purchase and enter into commitments for the purchase of mortgages and securities if the authority shall first determine that the proceeds of the sale of such mortgages and securities to the authority will be utilized for the purpose of residential housing for occupancy by persons or families of low and moderate income and

---

[1] Sec. 234.02 (1), Stats.
[2] Sec. 234.02 (3), Stats.

to enter into agreements with eligible sponsors, mortgagors or issuers of securities for the purpose of regulating the planning, development and management of housing projects financed in whole or in part by the proceeds of the mortgages or securities purchased by the authority.

"(14) To sell mortgages and security interests at public or private sale, to modify or alter mortgages and security interests, to foreclose on any such mortgage or security interest or commence any action to protect or enforce any right conferred upon it by any law, mortgage, security agreement, contract or other agreement, and to bid for and purchase property which was the subject of such mortgage or security interest, at any foreclosure or at any other sale, to acquire and to take possession of any such property; and in such event the authority may complete, administer, pay the principal and interest on any obligations incurred in connection with such property, dispose of and otherwise deal with, such property, in such manner as may be necessary or desirable to protect the interests of the authority therein.

"(15) To acquire or contract to acquire from any person by grant, purchase or otherwise, leaseholds, real or personal property or any interest therein, only when the authority finds that low- or moderate-income housing cannot be developed privately without an acquisition by the authority, or when the authority acquires property by reason of default by an eligible sponsor; to own, hold, clear, improve and rehabilitate and to sell, assign, exchange, transfer, convey, lease, mortgage or otherwise dispose of or encumber the same. Nothing in this chapter shall be deemed to impede the operation and effect of local zoning, building and housing ordinances or ordinances relating to subdivision control, land development, fire prevention or other ordinances having to do with housing or housing development.

"(16) To lease real or personal property and to accept federal funds for and participate in programs of leased housing pursuant to section 10 or 23 of the United States housing act of 1937, as now or hereafter amended by the housing and urban development act of 1965 or other amendments.

"(17) To procure insurance against any loss in connection with its property and other assets and to procure insurance on its debt obligations.

"(18) To invest any funds held in reserve or sinking funds or any moneys not required for immediate use or disbursement at the discretion of the authority in such investments as may be lawful for fiduciaries in the state, if at least 50% of any funds held in any reserve or sinking fund be invested in obligations of the state or of the United States or agencies or instrumentalities of the United States or obligations, the principal and interest of which are guaranteed by the United States or agencies or instrumentalities of the United States.

"(19) To consent, whenever it deems it necessary or desirable in the fulfillment of its corporate purpose, to the modification of the rate of interest, time of payment or any instalment of principal or interest, or any other term, of any mortgage loan, mortgage loan commitment, construction loan, temporary loan, contract or agreement of any kind to which the authority is a party.

"(20) To adopt such rules and set such standards as are necessary to effectuate its corporate purpose with respect to mortgage lending, construction lending and temporary lending."

Sec. 234.04, Stats., provides for loans to eligible sponsors of housing projects and to persons and families of low and moderate income.[3] The Authority may make

---

[3] Sec. 234.01, Stats., provides:

"(3) 'Eligible sponsor' means any housing corporation, limited-profit entity or nonprofit corporation or any other entity meeting criteria established by the authority and which is organized to provide housing for persons and families of low and moderate income.

"(4) 'Housing corporation' means a corporation organized under s. 182.004 and whose articles of incorporation, in addition to other requirements of law, provide that:

"(a) If the corporation receives any loan or advance from the authority under this chapter, it may enter into an agreement with the authority providing for regulation with respect to rents, profits, dividends and disposition of property or franchises; and

or participate in the making of construction loans to eligible sponsors of housing projects for the construction

"(b) If the corporation receives a loan or advance under this chapter, the chairman of the authority, acting with the prior approval of the majority of the members of the authority, may, if he determines that any such loan or advance is in jeopardy of not being repaid, that the proposed development for which such loan or advance was made is in jeopardy of not being constructed or that the corporation is not carrying out the intent and purposes of this chapter, appoint to the board of directors of such corporation a number of new directors, which number shall be sufficient to constitute a majority of such board, notwithstanding any other provision of such articles of incorporation or of any other provision of law.

"(5) 'Housing project' means a specific work or improvement within this state undertaken primarily to provide dwelling accommodations, including land development and the acquisition, construction or rehabilitation of buildings and improvements thereto, for residential housing, and such other nonhousing facilities as may be incidental or appurtenant thereto.

"(6) 'Limited-profit entity' means any person or trust which, in its articles of incorporation or comparable documents of organization, or by written agreement with the authority, provides that:

"(a) As a condition of acceptance of a loan or advance under this chapter, the limited-profit entity shall enter into an agreement with the authority providing for limitations of rents, profits, dividends and disposition of property or franchises; and

"(b) If the limited-profit entity receives a loan or advance under this chapter, the chairman of the authority, acting with the prior approval of the majority of members of the authority, may, if he determines that any such loan or advance is in jeopardy of not being repaid, that the proposed development for which such loan or advance was made is in jeopardy of not being constructed or that the limited-profit entity is otherwise not carrying out the intent and purposes of this chapter, appoint to the board of directors or other comparable controlling body of such limited-profit entity a number of new directors or persons, which number shall be sufficient to constitute a voting majority of such board or controlling body, notwithstanding any other provisions of the limited-profit entity's articles of incorporation or other documents of organization, or of any other provisions of law.

"(7) 'Nonprofit corporation' means a nonprofit corporation incorporated under ch. 181 whose articles of incorporation, in addition to other requirements of law, provide that:

or rehabilitation of housing for persons and families of low and moderate income, and may make or participate

"(a) The corporation has as its major purpose the providing of housing facilities for persons and families of low and moderate income;

"(b) All income and earnings of the corporation shall be used exclusively for corporation purposes and no part of the net income or net earnings of the corporation shall inure to the benefit or profit of any private person;

"(c) The corporation is in no manner controlled or under the direction or acting in the substantial interest of private persons seeking to derive profit or gain therefrom or seeking to eliminate or minimize losses in any dealing or transactions therewith;

"(d) If the corporation receives any loan or advance from the authority, it shall enter into an agreement with the authority, providing for limitations on rents, profits, dividends and disposition of property or franchises; and

"(e) That if the corporation receives a loan or advance under this chapter, the chairman of the authority, acting with the prior approval of the majority of the members of the authority, may, if he determines that any such loan or advance is in jeopardy of not being repaid, that the proposed development for which such loan or advance was made is in jeopardy of not being constructed, that some part of the net income or net earnings of the corporation is inuring to the benefit of any private person, that the corporation is in some manner controlled or under the direction of or acting in the substantial interest of any private person seeking to derive benefit or gain therefrom or seeking to eliminate or minimize losses in any dealings or transactions therewith or that the corporation is not carrying out the intent and purposes of this chapter, appoint to the board of directors of such corporation a number of new directors, which number shall be sufficient to constitute a majority of such board, notwithstanding any other provisions of such articles of incorporation or of any other provisions of law.

"(8) 'Persons and families of low and moderate income' means persons and families who cannot afford to pay the amounts at which private enterprise, without federally-aided mortgages or loans from the authority, can provide a substantial supply of decent, safe and sanitary housing and who fall within income limitations set by the authority in its rules. In determining such income limitations the authority shall consider the amounts of the total income of such persons available for housing needs, the

in the making and entering into commitments for the making of long-term mortgage loans to eligible sponsors of housing projects for occupancy by persons and families of low and moderate income or for the making of long-term mortgage loans to persons and families of low and moderate income. Such loans may be made only upon the determination by the Authority that construction loans or long-term mortgage loans are not otherwise available from private lenders upon reasonably equivalent terms and conditions. The Authority may employ, for such compensation as it determines, the services of any savings and loan association or banking institution in connection with any such long-term mortgage loan. The manner of security, interest rates, and repayment shall be determined by the Authority.

Sec. 234.08, Stats., provides:

". . . (1) The authority may issue its negotiable notes and bonds in such principal amount, as, in the opinion of the authority, is necessary to provide sufficient funds for achieving its corporate purposes, including the purchase of certain mortgages and securities and the making of secured loans for low- and moderate-income housing, for the rehabilitation of existing structures and for the construction of facilities appurtenant thereto as provided in this chapter; for the payment of interest on notes and bonds of the authority during construction; for the establishment of reserves to secure such notes and bonds; for the provision of moneys for the housing development fund in order to make temporary, loans to sponsors of housing projects as provided in this chapter; and for all other expenditures of the authority incident to and necessary or convenient to carry out its corporate purposes and powers.

---

size of the family, the cost and condition of available housing facilities, standards established for various federal programs and any other factors determined by the authority to be appropriate in arriving at such limitations. Among low- or moderate-income persons and families, preference shall be given to those displaced by governmental action."

"(2) The authority may issue renewal notes, issue bonds to pay notes and whenever it deems refunding expedient, refund any bonds by the issuance of new bonds, whether the bonds to be refunded have or have not matured, and issue bonds partly to refund bonds then outstanding and partly for any other purpose. The refunding bonds shall be sold and the proceeds applied to the purchase, redemption or payment of the bonds to be refunded.

"(3) Except as may otherwise be expressly provided by the authority, every issue of its notes or bonds shall be general obligations of the authority payable out of any revenues or moneys of the authority, subject only to any agreements with the holders of particular notes or bonds pledging any particular receipts or revenues.

"(4) All notes or bonds shall be negotiable investment securities under ch. 408."

As provided in sec. 234.09, Stats., the notes and bonds shall be authorized by resolution of the members of the Authority. Maturity, interest rates, denominations, form, registration, execution, payment, and terms of redemption shall be as provided in the resolution. The bonds may be in serial or term form and sold at public or private sale.

Sec. 234.10, Stats., provides:

". . . Any resolution authorizing any notes or bonds or any issue thereof may contain provisions, which shall be a part of the contract with the holders thereof, as to:

"(1) Pledging all or any part of the fees and charges made or received by the authority, and all or any part of the moneys received in payment of mortgage loans and interest thereon, and other moneys received or to be received, to secure the payment of the notes or bonds or of any issue thereof, and subject to such agreements with bondholders or noteholders as may then exist.

"(2) Pledging all or any part of the assets of the authority, including mortgages and obligations securing the same, to secure the payment of the notes or bonds or of any issue of notes or bonds, subject to such agreements with noteholders or bondholders as may then exist.

"(3) Pledging of any loan, grant or contribution from the federal or state government, any political subdivision of the state or source in aid of such development as provided for in this chapter.

"(4) The use and disposition of the gross income from mortgages owned by the authority and payment of principal of mortgages owned by the authority.

"(5) The setting aside of reserves or sinking funds and the regulation and disposition thereof.

"(6) Limitations on the purpose to which the proceeds of sale of notes or bonds may be applied and pledging such proceeds to secure the payment of the notes or bonds or of any issue thereof.

"(7) Limitations on the issuance of additional notes or bonds; the terms upon which additional notes or bonds may be issued and secured; the refunding of outstanding or other notes or bonds.

"(8) The procedure, if any, by which the terms of any contract with noteholders or bondholders may be amended or abrogated, the amount of notes or bonds the holders of which must consent thereto, and the manner in which such consent may be given.

"(9) Vesting in a trustee such property, rights, powers and duties in trust as the authority determines, which may include any or all of the rights, powers and duties of the trustee appointed by the noteholders or bondholders pursuant to s. 234.20 and limiting or abrogating the right of the noteholders or bondholders to appoint a trustee under s. 234.20 or limiting the rights, powers and duties of such trustee, in which event s. 234.20 shall not apply.

"(10) Any other matters, of like or different character, which in any way affect the security or protection of the notes or bonds."

Neither the members of the Authority nor any person executing the notes or bonds shall be personally liable thereon.[4] The Authority has the power to repurchase its notes and bonds for cancellation.[5] The Authority is lim-

[4] Sec. 234.12, Stats.
[5] Sec. 234.13, Stats.

ited, however, as to the amount of notes and bonds outstanding at any one time.[6]

Sec. 234.14, Stats., provides:

". . . The state shall not be liable on notes or bonds of the authority and such notes and bonds shall not be a debt of the state. All notes and bonds of the authority shall contain on the face thereof a statement to such effect."

Sec. 234.19, Stats., provides:

". . . The state pledges and agrees with the holders of any notes or bonds issued under this chapter, that the state will not limit or alter the rights vested in the authority to fulfill the terms of any agreements made with the holders thereof, or in any way impair the rights and remedies of the holders until the notes or bonds, together with the interest thereon, with interest on any unpaid instalments of interest, and all costs and expenses in connection with any action or proceeding by or on behalf of such holders, are fully met and discharged. The authority is authorized to include this pledge and agreement of the state in any agreement with the holders of such notes or bonds."

The state also covenants with the purchasers and all subsequent holders and transferees of notes and bonds issued by the Authority that, in consideration of the acceptance of any payment for the notes and bonds, ". . . [the Authority's] fees, charges, gifts, grants, revenues, receipts and other moneys received or to be received,

---

[6] Sec. 234.18, Stats., provides:

". . . The authority shall not have outstanding at any one time notes and bonds for any of its corporate purposes in an aggregate principal amount exceeding $150,000,000, excluding bonds and notes being issued to refund outstanding notes and bonds. The authority shall not have outstanding more than $100,000,000 in bonds prior to July 1, 1973, and the authority shall consult with and coordinate the issuance of bonds with the state bond board prior to the issuance of any bonds."

pledged to pay or secure the payment of such notes or bonds shall at all times be free and exempt from all state, city, county or other taxation provided by the laws of the state." [7]

Sec. 234.26, Stats., provides:

". . . The state, the investment board, all public officers, municipal corporations, political subdivisions and public bodies, all banks and bankers, savings and loan associations, credit unions, trust companies, savings banks and institutions, investment companies, insurance companies, insurance associations and other persons carrying on a banking or insurance business, and all executors, administrators, guardians, trustees and other fiduciaries, may legally invest any sinking funds, moneys or other funds belonging to them or within their control in any notes or bonds issued by the authority. Such notes and bonds shall be authorized security for all public deposits and shall be fully negotiable in this state."

The financial and operational structure of the Authority is channeled through three funds, the housing development fund, the capital reserve fund and the general reserve fund.

The housing development fund, sec. 234.05, Stats., is a revolving fund into which shall be paid any moneys received as interest on or in repayment of temporary loans made from the housing development fund, any moneys transferred by the Authority to the housing development fund from other funds or sources, and any other moneys which may be made available to the Authority for the purpose of the housing development fund from any other source. The use of the moneys held in the housing development fund is delineated in sec. 234.06:

". . . (1) The authority may use the moneys held in the housing development fund to make temporary loans

---

[7] Sec. 234.28, Stats.

to eligible sponsors, with or without interest, and with such security for repayment, if any, as the authority determines reasonably necessary and practicable, solely from the housing development fund, to defray development costs for the construction of proposed housing projects for occupancy by persons and families of low and moderate income. No temporary loan may be made unless the authority may reasonably anticipate that satisfactory financing may be obtained by the eligible sponsor for the permanent financing of the housing project.

"(2) The proceeds of the temporary loan may be used only to defray the development costs of the housing project. Each temporary loan shall be repaid in full by the eligible sponsor to the authority concurrent with the receipt by the eligible sponsor of the proceeds of the permanent financing.

"(3) The authority may use the moneys held in the housing development fund to make grants to counties, cities, villages and towns and eligible sponsors, in such amounts as the authority determines, not to exceed the net costs, exclusive of any federal aid or assistance, as are incurred by the counties, cities, villages or towns or eligible sponsors in a plan of land and building acquisition, improvements, renewal, relocation or conservation, for the purpose of providing housing or facilities reasonably related to such housing."

The Authority is directed, pursuant to sec. 234.15, Stats., to establish a special fund, denominated the "capital reserve fund," to secure the notes and bonds. There shall be paid into the capital reserve fund any moneys appropriated and made available by the state for the purposes of such fund, any proceeds from the sale of notes and bonds to the extent provided in the resolution, and any other moneys made available for the purposes of such a fund from whatever source. Sec. 234.15 further provides:

"(2) All moneys held in the capital reserve fund, except as otherwise specifically provided, shall be used solely for the payment of the principal of bonds of the

authority as the same mature, the making of sinking fund payments with respect to bonds of the authority, the purchase of bonds of the authority, the payment of interest on bonds of the authority or the payment of any redemption premium required to be paid when bonds are redeemed prior to maturity. Except for the purpose of paying principal of and interest on bonds of the authority maturing and becoming due and for the payment of which other moneys of the authority are not available, and except for making sinking fund payments with respect to bonds of the authority and for the payment of which other moneys of the authority are not available, moneys in the capital reserve fund shall not be withdrawn at any time in such amount as would reduce the fund to less than an amount, called in this chapter 'capital reserve fund requirement', equal to the maximum amount, in any succeeding year, of principal and interest, other than principal and interest for which sinking fund payments are specified in any resolution of the authority authorizing bonds of the authority then outstanding, maturing and becoming due in such year on all bonds of the authority then outstanding plus all amounts specified, in any resolution of the authority authorizing bonds of the authority then outstanding, as payable as a sinking fund payment in such year. Any income or interest earned by, or increment to, the capital reserve fund due to the investment thereof may be transferred by the authority to the general reserve fund or other fund of the authority to the extent it does not reduce the amount of the capital reserve fund below the capital reserve fund requirement.

"(3) The authority shall not issue bonds at any time if the capital reserve fund requirement, after such issuance, will exceed the amount of the capital reserve fund at the time of issuance unless the authority, at the time of issuance of such bonds, shall deposit in the capital reserve fund from the proceeds of the bonds so to be issued, or from another available source, an amount which, together with the amount then in the capital reserve fund, will be not less than the capital reserve fund requirement after such issuance.

"(4) To assure the continued operation and solvency of the authority for the carrying out of the public purposes of this chapter, the authority shall accumulate

in the capital reserve fund an amount equal to the capital reserve fund requirement. In order further to assure such maintenance of the capital reserve fund:

"(a) The chairman of the authority shall, in each even-numbered year on or before the date prescribed by the secretary of administration, certify to the governor and secretary of administration such amount, if any, necessary to restore the capital reserve fund to an amount equal to the capital reserve fund requirement. The governor and the secretary of administration shall include in the biennial budget of the immediately succeeding odd-numbered year the amount so certified by the chairman of the authority.

"(b) In each odd-numbered year, on or before the date prescribed by the governor, the chairman of the authority shall certify to the governor such amount, if any, necessary to restore the capital reserve fund to an amount equal to the capital reserve fund requirement. The governor shall, in the immediately succeeding even-numbered year, include this amount in his recommendations, in bill form, to the joint committee on finance for introduction without change in either house.

"(5) . . ."

The moneys deposited in the general reserve fund, pursuant to sec. 234.16, Stats., may be used by the Authority for repayment of advances from the state; to pay all costs, expenses and charges of financing, including fees and expenses of trustees and paying agents; for repayment of the principal of and interest on the notes and bonds; and for "such other corporate purposes" as the Authority in its discretion determines.

Sec. 234.20, Stats., provides the remedies available to the holders of notes and bonds issued by the Authority and for the appointment of a trustee in the event of default.

Sec. 234.30, Stats., provides:

". . . The heads of all departments, boards, councils, committees and commissions in the administrative branch, and the heads of the various divisions, sections and departments thereunder, shall extend their full and

unlimited cooperation, including but not limited to the providing of personnel and facilities, to the authority."

The first meeting of the Authority was held on November 1, 1972. Officers were elected and an executive director appointed. At the initial meeting, the members also adopted rules and regulations, directed that proposals for legal, accounting and underwriting services be solicited, retained legal counsel, and authorized the executive director to requisition the funds appropriated by sec. 20.135, Stats., and to negotiate various agreements with agencies of the state of Wisconsin and other entities.

At meetings on November 29, 1972, and December 12, 1972, the Authority adopted bylaws, adopted a form of agreement between the Authority and Blyth Eastman Dillon, senior managing underwriter, and accepted as part of the Authority's official record a report containing evidence of the housing situation in Wisconsin.

December 20, 1972, Blyth Eastman Dillon accepted the form of agreement adopted at the December 12, 1972, meeting for the position of senior managing underwriter for the Authority.

January 24, 1973, the Authority adopted the bond resolution, which established the details on the financial structure of the Authority, and the issue resolution, governing issuance of the $100,000 of the Authority's bonds here in controversy.

Subsequently, Blyth Eastman Dillon submitted an offer to purchase the bonds. The offer was conditioned upon the following:

"(a) that the Authority is and will be at the date of Closing duly existing as a public body corporate and politic of the State of Wisconsin duly organized and validly existing under the Constitution and laws of the State of Wisconsin with the powers and authorities set forth in Chapter 234, Wisconsin Statutes (Chapter 287, Laws of 1971). . .;

". . .

"(c) the various purposes to which the proceeds of the sale of the Bonds may be applied are lawful purposes under the Act and the Constitution of the State of Wisconsin;

"(d) that the Bonds when issued, shall be valid, direct and general obligations of the Authority, enforceable in accordance with their terms, entitled to the benefits of the Act and of the Bond Resolution and the Issue Resolution, and duly authorized by the Act and the Constitution of the State of Wisconsin; and

"(e) that the duty of the chairman of the Authority to certify to the Governor and Secretary of Administration of the State of Wisconsin the amount, if any, necessary to restore the capital reserve fund to an amount equal to the capital reserve fund requirement and the duty of the Governor to include that amount in the biennial budget or in bill form in his recommendations to the joint committee on finance as set forth in Section 234.15 (4), Wis. Stats., do not contravene any provision of the Constitution of the State of Wisconsin;

". . ."

January 24, 1973, the Authority accepted Blyth Eastman Dillon's offer to purchase the bonds. February 13, 1973, Blyth Eastman Dillon, acting on advice of counsel, advised the Authority that it would not accept delivery of the bonds on the grounds that the Authority had failed to fulfill the conditions previously enumerated.

February 28, 1973, the Authority submitted its allotment request and voucher to the Secretary for the $250,000 appropriation authorized by sec. 20.135, Stats. The Secretary denied this request and refused to issue his warrant for the funds, for the reasons that secs. 2 and 3 of ch. 287, Laws of 1971, are unconstitutional.

We consider the issues presented in these proceedings to be:

1. Was ch. 234, Stats., enacted for other than a public and statewide purpose?

2. What is the nature of the Wisconsin Housing Finance Authority?

3. Does ch. 234, Stats., create state debt, in violation of art. VIII, secs. 4 and 7, Wisconsin Constitution, or constitute a pledge of the state's credit in violation of art. VIII, sec. 3, Wisconsin Constitution?

4. Does sec. 234.30, Stats., compel payment of state funds, in violation of art. VIII, sec. 2, Wisconsin Constitution?

5. Does ch. 234, Stats., involve the state in "works of internal improvement," in violation of art. VIII, sec. 10, Wisconsin Constitution?

6. Does sec. 234.28, Stats., grant an unreasonable exemption from taxation, in violation of art. VIII, sec. 1, Wisconsin Constitution?

7. Does ch. 234, Stats., delegate legislative authority, in violation of art. IV, sec. 1, Wisconsin Constitution?

8. Does ch. 234, Stats., grant corporate powers and privileges by special or private law, in violation of art. IV, secs. 31 and 32, Wisconsin Constitution?

9. Is sec. 234.15, Stats., unconstitutional as an encroachment upon the power granted to the governor by art. V, secs. 4 and 10, Wisconsin Constitution?

Recently, this court in *State ex rel. Hammermill Paper Co. v. La Plante* (1973), 58 Wis. 2d 32, 205 N. W. 2d 784, discussed the burden a party carries when challenging the constitutionality of legislative acts. In *Hammermill, supra,* the respondent challenged the constitutionality of sec. 66.521, Stats., which authorizes municipal bonding for the promotion of industry. This court, at pages 45–47, stated:

"The respondent carries a heavy burden if he is to prevail in his attack upon the constitutionality of sec. 66.521, Stats. It is not enough that respondent establish doubt as to the act's constitutionality nor is it sufficient that respondent establish the unconstitutionality of the act as a probability. Unconstitutionality of the act must be demonstrated beyond a reasonable doubt. Every presumption must be indulged to sustain the law if at all

possible and, wherever doubt exists as to a legislative enactment's constitutionality, it must be resolved in favor of constitutionality. This court has often affirmed the well-established presumption of constitutionality that attaches itself to all legislative acts. . . .

"...

"Therefore, in order for this court to strike down an act of the legislature, it is necessary to find that it offends specific provisions of the state constitution which have limited and circumscribed legislative action."

Under our constitutional system, this court is not concerned with the wisdom of the legislative enactment. The duties of this court are limited to considering whether or not the legislation contravenes a specific provision of the constitution. *Hammermill, supra,* pages 46 and 47; *Gottlieb v. Milwaukee* (1967), 33 Wis. 2d 408, 415, 147 N. W. 2d 633; *Chicago & N. W. R. Co. v. La Follette* (1965), 27 Wis. 2d 505, 521, 135 N. W. 2d 269; *A B C Auto Sales, Inc. v. Marcus* (1949), 255 Wis. 325, 330, 331, 38 N. W. 2d 708.

### Public purpose.

While no specific clause in the constitution can be acclaimed as the genesis of the public purpose doctrine,[3]

---

[3] The origin of the public purpose doctrine has been variously attributed by this court to the due process and equal protection clauses of the state and federal constitutions, *State ex rel. Wisconsin Development Authority v. Dammann* (1938), 228 Wis. 147, 277 N. W. 278, 280 N. W. 698; art. IV, sec. 4, of the United States Constitution, which guarantees to every state a republican form of government, *Heimerl v. Ozaukee County* (1949), 256 Wis. 151, 40 N. W. 2d 564; and art. VIII, sec. 2, of the Wisconsin Constitution which provides that no money shall be paid out of the treasury except in pursuance of an appropriation by law. *State ex rel. La Follette v. Reuter* (1967), 33 Wis. 2d 384, 147 N. W. 2d 304. Other authors have attributed the doctrine to judicial articulation of the belief that governmental power should be used for

it is a "well-established constitutional tenet." [9] Public funds may be expended for only public purposes. An expenditure of public funds for other than a public purpose would be abhorrent to the constitution of Wisconsin.

What constitutes public purpose is in the first instance a question for the legislature to determine and its opinion should be given great weight. *Hammermill, supra; State ex rel. Warren v. Reuter* (1969), 44 Wis. 2d 201, 170 N. W. 2d 790; *State ex rel. Bowman v. Barczak, supra; David Jeffrey Co. v. Milwaukee* (1954), 267 Wis. 559, 66 N. W. 2d 362. If any public purpose can be conceived which might rationally be deemed to justify the act or serve as a basis for the instant expenditure, the test is satisfied and the court cannot further weigh the adequacy of the need or the wisdom of the method. *State ex rel. Singer v. Boos* (1969), 44 Wis. 2d 374, 171 N. W. 2d 307; *State ex rel. Zillmer v. Kreutzberg* (1902), 114 Wis. 530, 90 N. W. 1098. The court in *West Allis v. Milwaukee County* (1968), 39 Wis. 2d 356, 377, 159 N. W. 2d 36, stated:

". . . Only if it is 'clear and palpable' that there can be no benefit to the public is it possible for a court to conclude that no public purpose exists. . . ."

In *Hammermill, supra,* pages 48 and 49, this court stated:

"What constitutes a public purpose is in the first instance a question for the legislature to determine. This court in *State ex rel. La Follette v. Reuter, supra,* at pages 114 and 115, stated:

the benefit of the entire community. Mills, *The Public Purpose Doctrine in Wisconsin,* 1957 Wis. L. Rev. 40.

*See also: State ex rel. Bowman v. Barczak* (1967), 34 Wis. 2d 57, 62, 63, 148 N. W. 2d 683; Eich, *A New Look At The Internal Improvements And Public Purpose Rules,* 1970 Wis. L. Rev. 1115.

[9] *Hammermill, supra,* pages 47 and 48.

" 'The rule for determining the public purpose for expenditure of public funds is set forth in *State ex rel. Thomson v. Giessel* (1953), 265 Wis. 207, 215, 216, 60 N. W. 2d 763:

" ' "The general rule as to the public purpose of the expenditure of public funds is stated in 81 C. J. S., States, p. 1149, sec. 133, as follows:

" ' " " 'Generally, in connection with the validity of the expenditure of state funds, what is . . . a public purpose, is a question for the legislature to decide, with respect to which it is vested with a large discretion, which cannot be controlled by the courts unless its action is clearly evasive. . . . Where a doubt exists whether the purpose of an appropriation is public or private, it will be resolved in favor of the validity of the appropriation, . . .' "

" 'The *Thomson Case* (1953), *supra*, at page 216, cited with approval, *Carmichael v. Southern Coal & Coke Co.* (1937), 301 U. S. 495, 57 Sup. Ct. 868, 81 L. Ed. 1245, which states:

" ' " " '. . . The existence of *local conditions* which, because of their nature and extent, are of concern to the public as a whole, the *modes of advancing the public interest* by correcting them or avoiding their consequences, *are peculiarly within the knowledge of the legislature,* and to it, and not to the courts, is committed the duty and responsibility of making choice of the possible methods. [Citations.] As with expenditures for the general welfare of the United States [Citations], *whether the present expenditure serves a public purpose is a practical question addressed to the lawmaking department, and it would require a plain case of departure from every public purpose which could reasonably be conceived to justify the intervention of a court.* [Citations.]' " ' "

The legislature, in sec. 1, ch. 287, Laws of 1971, made the following legislative declaration concerning Wisconsin's existing housing situation:

"(1) It is determined that there exists in rural and urban areas of the state a seriously inadequate supply of and a pressing need for safe and sanitary dwelling

accommodations within the financial means of low- and moderate-income families and persons including but not limited to elderly persons and those persons displaced by clearings of slums and blighted areas or other public programs.

"(2) It is further declared that this shortage of housing for low- and moderate-income families and persons is inimical to the safety, health, education, morals, welfare and comfort of the residents of the state and to the growth and development of its communities. An adequate supply of safe and sanitary housing of a variety of housing types serving persons and families of all income levels and properly planned and related to schools, public transportation, public utilities, sources of employment and service is essential to the orderly growth and prosperity of the state and its communities. Present patterns of providing housing unduly limit the housing options for many people in the state's urban centers, smaller cities and nonmetropolitan areas.

"(3) It is further declared that continuing present patterns of providing housing will limit the ability of the private building industry and the investment industry to produce, without assistance, the needed construction of sanitary, decent and safe residential dwellings at prices and rentals which persons and families of low and moderate income can afford, and will result in a failure to provide long-term mortgage financing for housing for low- and moderate-income families.

"(4) It is further declared that the provision of an adequate supply of housing for low- and moderate-income families and persons has been greatly restricted by the rapidly increasing costs of financing housing and that providing an adequate supply of housing to meet the needs of low- and moderate-income families and persons will not be possible until and unless the cost of mortgage financing for housing for low- and moderate-income families and persons is reduced by state action.

"(5) It is further declared that the housing requirements of persons and families of low and moderate income in rural areas of the state frequently are not of sufficient magnitude to make economically feasible, without assistance, the construction of housing by the private building and investment industries or to justify the administrative costs and burden of obtaining federal aid.

"(6) It is further declared that housing assistance programs provided by the federal government have been unable to meet the housing needs of low- and moderate-income families and persons in this state without state action to supplement federal programs. The legislature also finds that the provision of continued and additional federal resources to assist in the reduction of housing costs for low- and moderate-income families and persons is and is likely to become more dependent upon this state providing administrative capability and a state housing development program to add to and more effectively utilize federal funds.

"(7) It is further declared that insufficient funds and the absence of local housing authorities in many areas of the state have limited the ability of local authorities alone to meet the housing needs of persons and families of low and moderate income. To further facilitate the construction of housing for persons and families of low and moderate income in rural and urban areas of the state, there is a need for the creation of a state authority which can operate under a state-wide plan in cooperation with local housing authorities.

"(8) It is further declared that in establishing a Wisconsin housing finance authority, the legislature is acting in all respects for the benefit of the people of this state to serve a public purpose in improving and otherwise promoting their health, welfare and prosperity and that the Wisconsin housing finance authority, as created by this act, is empowered to act on the behalf of the people of this state in serving this public purpose for the benefit of the general public.

"(9) It is further declared that it is a valid public purpose to assist in the construction of housing for low- and moderate-income families and persons who would otherwise be unable to obtain adequate housing at prices or rentals they could afford and to assist in the elimination of substandard conditions by housing persons of varied economic means and a wide range of incomes in developments and neighborhoods properly planned and related to public facilities and sources of employment and services and to provide the necessary powers to accomplish these public purposes."

Although legislative declarations of public purpose are to be afforded great weight and wide discretion, this court is not bound by such expressions. This court's constitutional burden to examine, for itself, the existence of public purpose was considered and set forth in *Hammermill, supra,* pages 50 and 51.

Respondents argue that the Act, in seeking to eliminate substandard housing conditions, confers benefits upon private individuals, and, in particular, families of moderate income. While it is true that to sustain a public purpose the advantage to the public must be direct and not merely incidental,[10] the fact that the Act may benefit certain individuals or one particular class of people, more immediately than other individuals or classes does not necessarily deprive the Act of its public purpose. *Hammermill, supra; State ex rel Thomson v. Giessel* (1953), 265 Wis. 207, 60 N. W. 2d 763; *State ex rel. Atwood v. Johnson* (1919), 170 Wis. 218, 175 N. W. 589; *Carmichael v. Southern Coal & Coke Co.* (1937), 301 U. S. 495, 57 Sup. Ct. 868, 81 L. Ed. 1245. This court, in *State ex rel. Wisconsin Development Authority v. Dammann, supra,* page 182, stated:

". . . The rule that the benefits to the public must be direct and not remote and that the past course or usage of government is to be resorted to for guidance must in each case be considered in the light of the principle that the legislature has a very wide discretion to determine what constitutes a public purpose, and that courts will not interfere unless at first blush the act appears to be so obviously designed in all its principal parts to benefit private persons and so indirectly or remotely to affect the public interest that it constitutes the taking of property of the taxpayers for private use. It is to be observed that the tendency of later cases is toward greater liberal-

[10] *State ex rel. Bowman v. Barczak, supra; State ex rel. Wisconsin Development Authority v. Dammann, supra.*

ity in characterizing taxes or appropriations as public in purpose, doubtless in recognition of the fact, as was stated in *Laughlin v. City of Portland, supra,* that:

" 'Times change. The wants and necessities of the people change. The opportunity to satisfy those wants and necessities by individual efforts may vary. . . . On the one hand, what could not be deemed a public use a century ago, may, because of changed economic and industrial conditions, be such today. . . . Its two tests are: First, the subject matter, or commodity, must be one "of public necessity, convenience or welfare." . . . The second test is the difficulty which individuals have in providing it for themselves.' "

The legislature has declared that there exists a serious inadequate supply of safe and sanitary dwelling accommodations within the financial means of low and moderate income families, and that such a shortage is inimical to the safety, health, education, morals, welfare and comfort of the residents of this state. In its report on the Wisconsin housing situation, the bureau of planning and budget of the department of administration states that 12 percent of this state's housing units are inadequate and that nearly 19 percent of the families who live in this state live in this inadequate housing. The report also indicates that there is a 2.0 vacancy rate (housing units vacant and available for sale or rental) as a percentage of all housing units for Wisconsin as compared to a rate of 3.1 percent for the United States in general, and that, generally, a vacancy rate below 3.0 percent means that the housing market cannot function effectively.

The great majority of jurisdictions that have enacted legislation similar to ch. 234, Stats., have held such legislation to be for a public purpose.[11] The North Carolina

[11] *Walker v. Alaska State Mortgage Asso.* (Alaska 1966), 416 Pac. 2d 245; *Maine State Housing Authority v. Depositors Trust Co.* (Maine 1971), 278 Atl. 2d 699; *Massachusetts Housing Finance Agency v. New England Merchants Nat. Bank* (1969), 356 Mass. 202, 249 N. E. 2d 599; *New Jersey Mortgage Finance*

Supreme Court in *Martin v. Housing Corp.* (1970), 277 N. C. 29, 49, 50, 175 S. E. 2d 665, stated:

"Unquestionably, when construction of residential housing is made possible by the Corporation's assistance, all persons in the building industry benefit from such construction. Such benefit is similar to that which results from the construction of any public project, *e. g.*, public buildings, school buildings, highways, etc. Too, the 'persons and families of lower income' who will occupy such residential housing as owners or tenants will benefit from the existence and availability thereof. Although these benefits will flow from the Corporation's authorized activities, its *raison d'etre*, the reason and justification for its existence, is to make available decent, safe and sanitary housing to 'persons and families of lower income' who cannot otherwise obtain such housing accommodations. The General Assembly, with good reason, was fully aware that the acquisition of homes by 'persons and families of lower income' gives them a stake in the preservation of our society. Nothing could contribute more to the stability of our institutions than the acquisition of homes by an ever-increasing proportion of our people." [12]

It cannot seriously be questioned that the safety, health, education, morals, welfare and comfort of the residents of this state are of great concern and the proper objects of our state government's interest. It is also reasonable to assume that the elimination of unsafe, unsanitary and

*Agency v. McCrane* (1970), 56 N. J. 414, 267 Atl. 2d 24; *Vermont Home Mortgage Credit Agency v. Montpelier Nat. Bank* (1970), 128 Vt. 272, 262 Atl. 2d 445; *State ex rel. West Virginia Housing Development Fund v. Copenhaver* (1969), 153 W. Va. 636, 171 S. E. 2d 545.

But see: *In Re Advisory Opinion* (1968), 380 Mich. 554, 158 N. W. 2d 416.

[12] For cases holding that the inclusion of families of moderate income in the project does not destroy the public purpose of the project, see: *Massachusetts Housing Finance Agency v. New England Merchants Nat. Bank of Boston, supra*, pp. 605, 606; *Vermont Home Mortgage Credit Agency v. Montpelier Nat. Bank, supra*, page 449.

overcrowded housing will promote these objectives. It is not for this court to consider whether this policy is sound as a matter of economics and public policy. That is a legislative matter. The declaration of purpose enunciated by the legislature, supported by the department of administration's report, demonstrates that ch. 234, Stats., evidences a public purpose.

Respondents argue that because of the vagueness of standards by which the Authority is to operate, there is no assurance that a proper balance will be struck between private and public benefit.

Respondents seek to substitute presumed factual consequences for existing facts. This court will not overturn a legislative enactment on the basis of presumptive unconstitutional consequences. As previously noted, all legislative enactments are entitled to a strong presumption of constitutionality. This court in *State ex rel. Bowman v. Barczak, supra,* page 69, stated:

". . . The possibility of operational illegality does not of itself condemn the legislation because, as noted earlier, we presume constitutionality, and the relator has not presented us with facts demonstrating that the instant expenditure is not for a valid public purpose under the statute."

In addition to the rule that public funds must be spent for public benefit, there exists a general rule applicable to appropriations that a tax must be spent at the level at which it is raised. Applied to the instant case, this means that ch. 234, Stats., must not only evidence a public purpose but also a state purpose. *State ex rel. Wisconsin Development Authority v. Dammann, supra,* at page 183.

Respondents contend that the expenditure of funds for public housing, whether in the form of furnishing services, facilities, loans or direct grants, is not a statewide purpose, in that particular localities with particular housing problems will be the beneficiaries.

This argument confuses the means with the end. The act seeks to improve the safety, health, education, morals, welfare and comfort of the people of this state through the elimination of substandard housing. The promotion and financing of adequate housing for families of low and moderate income, including elderly persons and those persons displaced by clearance of slums and blighted areas and other public programs, is the means through which the legislature has chosen to achieve this goal. While areas of substandard housing conditions can be localized, the effects of such a condition, found by the legislature to be detrimental to the public welfare, transcends city, village, town or county lines. The by-products of substandard housing are not confined to the area that breeds them but permeates throughout the state.

The best judge of what is necessary to meet the needs of the public and in what manner the service shall be directed is the legislature. *State ex rel. La Follette v. Reuter, supra; State ex rel. Thomson v. Giessel* (1953), 265 Wis. 185, 60 N. W. 2d 873. While the legislature cannot, under the guise of public and statewide purpose, enact a law that in its realistic operation benefits not the enumerated public and state purpose but private interests,[13] no such problem exists in this case in that the declaration of the legislature is supported by the facts.

The promotion and protection of public health and welfare is a matter of both public purpose and statewide concern. *State ex rel. Warren v. Reuter, supra; State ex rel. Martin v. Juneau* (1941), 238 Wis. 564, 300 N. W. 187. If the purpose to be obtained constitutes a public and

---

[13] In *State ex rel. Reynolds v. Nusbaum* (1962), 17 Wis. 2d 148, 115 N. W. 2d 761, this court did not accept the declaration of the legislature but determined the purpose of the school bus law in its "realistic operation" was to benefit the private schools rather than promote the safety of children.

state purpose, the means applied to achieve this purpose is largely within the discretion of the legislature.

In the instant case, whatever benefit is derived by private individuals and specific localities is necessary and incidental to the promotion of public health, safety, education, morals, welfare and comfort of the people of this state. The advantage to the public of increasing the supply of adequate housing and eliminating the by-products of substandard housing is direct and not indirect or remote. Ch. 234, Stats., evidences both a public and statewide purpose.[14]

---

[14] Respondents argue that *State ex rel. Martin v. Giessel* (1948), 252 Wis. 363, 31 N. W. 2d 626, is dispositive of this issue. This case dealt primarily with the issue of whether such assistance involved the state in works of internal improvement, art. VIII, sec. 10 of the constitution. The concept of statewide purpose was mentioned only in citation of an opinion of the attorney general, 35 Op. Atty. Gen. 394, 401. The attorney general's opinion declared a similar law to constitute other than a statewide purpose and a work of internal improvement. The decision in *State ex rel. Martin v. Giessel, supra,* rested principally upon internal improvement law.

In *State ex rel. Martin v. Giessel, supra,* this court approved state assistance to certain individuals or governmental subdivisions of the state as the method chosen by the legislature to promote a public and statewide purpose. *See: State ex rel. Warren v. Reuter, supra* (aid to private school to promote medical education); *State ex rel. La Follette v. Reuter, supra* (assistance to municipalities for construction of sewerage treatment plants); *State ex rel. Thomson v. Giessel, supra* (payments to towns under Forest Crop Law).

*See also: Appeal of Van Dyke* (1935), 217 Wis. 528, 259 N. W. 700; *State ex rel. Atwood v. Johnson, supra; Brodhead v. Milwaukee* (1865), 19 Wis. (*624), 658 (veterans' cash bonuses); and *State ex rel. New Richmond v. Davidson* (1902), 114 Wis. 563, 88 N. W. 596, 90 N. W. 1067 (discharge of city's debt incurred by natural disaster).

*Contra: State ex rel. Wisconsin Development Authority v. Dammann, supra* (direct state assistance to establishment of municipal public utilities).

*Nature of the Authority and art. VIII, sec. 7 (2) (d), Wisconsin Constitution.*

Sec. 234.02, Stats., provides that the Authority is a public body corporate and politic. This court must, however, look beyond this legislative denomination to the powers and structure conferred upon the entity in order to determine its nature.[15]

Sec. 234.02 (1), Stats., provides that the members of the Authority shall include the secretary of local affairs and six public members appointed by the governor by and with the advice and consent of the senate for staggered four-year terms. The Authority, pursuant to sec. 234.03, is granted all the powers "necessary or convenient" to implement its public purpose, including but not limited to the power to sue and be sued; to have perpetual existence; to make and execute contracts; to incur debt; to acquire and dispose of mortgages or security interests; to acquire leaseholds, real or personal property or any interest therein; and, under certain conditions, to own, hold, clear, improve and rehabilitate and to sell, assign, exchange, transfer, convey, lease, mortgage or otherwise dispose of or encumber the same. The Authority has the power to hold and disburse its own funds independent of state warrants. It has the power to borrow money and issue and sell bonds and other evidences of indebtedness to accomplish its purposes. Its debts thus created are satisfied out of rents and interest the Authority receives from the property the Authority acquires and the investments it makes.

The powers conferred upon the Authority support the legislative declaration that the Authority is an independent entity, denominated a public body corporate and politic. To the extent the words denote interdependence

[15] *Sullivan v. Board of Regents of Normal Schools* (1932), 209 Wis. 242, 244 N. W. 563.

and a common identity, the Authority is neither an arm nor agent of the state.[16]

The legislature has the power to create separate entities designed to carry on a public purpose. *Townsend v. Wisconsin Desert Horse Asso.* (1969), 42 Wis. 2d 414, 423, 167 N. W. 2d 425.[17] The obvious purpose behind the creation of many such entities has been the indirect achievement of some purpose that the state cannot achieve directly because of various constitutional limitations placed upon the power of the state. While it has been intimated that such plans are a subterfuge to evade the constitutional provisions, such attacks have been rejected on the theory that it is never an illegal evasion to accomplish a desired result, lawful in itself, by discovering a legal way to do it.[18]

Under this theory many so-called "dummy" corporations were created by the legislature and approved by this court, whose purpose was to construct or finance a facility for use or occupancy by the state. The typical "dummy" corporation would lease land from the state at a certain rent, borrow money to finance construction of buildings or improvements, and sublease the property back to the state at a rent greater than that provided in the lease. Although the state would obligate itself to the payment of said rentals and would eventually own

[16] The Authority constitutes an "independent going concern" within the meaning of such a term used in those cases in which this court has examined the character of legislatively created entities in order to determine liability thereof to suit. *See: Majerus v. Milwaukee County* (1968), 39 Wis. 2d 311, 159 N. W. 2d 86; *Sullivan v. Board of Regents of Normal Schools, supra.*

[17] *See also: Herro v. Wisconsin Federal Surplus Property Development Corp.* (1969), 42 Wis. 2d 87, 166 N. W. 2d 433; *Majerus v. Milwaukee County, supra.*

[18] *State ex rel. Thomson v. Giessel* (1955), 271 Wis. 15, 72 N. W. 2d 577; *State ex rel. Thomson v. Giessel* (1953), *supra; Tranter v. Allegheny County Authority* (1934), 316 Pa. 65, 173 Atl. 289.

the only property interest in the completed project, the state would disclaim any liability for the obligations of the "dummy" corporations. The state's obligation to make rental payments sufficient to cover the cost of construction was not considered "debt" within the meaning of various constitutional provisions.[19] Although without the constitutional proscriptions, the state, in effect, obligated itself to pay the construction costs of the facilities.

In 1969, the constitution was amended to provide that the state may contract public debt directly.[20] Art. VIII, sec. 7 (2) (a), Wisconsin Constitution, now provides:

"(2) Any other provision of this constitution to the contrary notwithstanding:
"(a) The state may contract public debt and pledges to the payment thereof its full faith, credit and taxing power to acquire, construct, develop, extend, enlarge or improve land, waters, property, highways, buildings, equipment or facilities for public purposes."

However, in addition to expanding the state's power to incur debt directly, within prescribed limits, the amendment sought to eliminate certain indirect financing as carried on between "dummy" corporations and the state. Art. VIII, sec. 7 (2) (d), provides:

"(d) No money shall be paid out of the treasury, with respect to any lease, sublease or other agreement entered into after January 1, 1971, to the Wisconsin State Agencies Building Corporation, Wisconsin State Colleges Building Corporation, Wisconsin State Public Building Corporation, Wisconsin University Building Corporation or any similar entity existing or operating for similar purposes pursuant to which such nonprofit corporation or such other entity undertakes to finance or provide a facility for use or occupancy by the state or an agency, department or instrumentality thereof."

---

[19] *See: State ex rel. Thomson v. Giessel* (1955), *supra* (Wisconsin University Building Corporation, Wisconsin State Public Building Corporation).

[20] Amended April 1, 1969.

Respondents argue that the Authority and its activities are within the proscription of art. VIII, sec. 7 (2) (d), Wisconsin Constitution.

Ch. 234, Stats., is not repugnant to art. VIII, sec. 7 (2) (d), Wisconsin Constitution. The purpose of this section was to prevent the utilization of state money to liquidate the construction debts of nonprofit corporations established to provide facilities for the use or occupancy of the state. Ch. 234 does not contemplate nor authorize the expenditure of state moneys pursuant to a lease, sublease or other agreement between the Authority and the state. The Authority is not authorized to undertake the financing or construction of a facility for the use or occupancy by the state or an agency, department or instrumentality thereof.

Art. VIII, sec. 7 (2) (d), Wisconsin Constitution, does not prevent all nonprofit organizations or corporations, established for a public purpose, from carrying on that purpose. It prohibits the type of indirect financing for the purposes enunciated therein, as evidenced by the type of agreements that traditionally existed between the corporations specifically enumerated in sec. 7 (2) (d) and similar entities and the state. Where no state money is appropriated out of the state treasury for the purpose of meeting the state's obligations under such an agreement, art. VIII, sec. 7 (2) (d) is not violated.

*Does ch. 234, Stats., create state debt in violation of art. VIII, sec. 4 and sec. 7, or constitute a pledge of the state's credit in violation of art. VIII, sec. 3?*

Art. VIII, sec. 4, forbids the state from contracting any debt except in the manner and amount provided by that article.

The word "debt," as used in the constitution, means all absolute obligations to pay money or its equivalent. This court, in *State ex rel. Owen v. Donald* (1915), 160 Wis.

21, 59, 151 N. W. 331, defined "debt" in the following manner:

"There is nothing particularly technical about the meaning of the word 'debt' as used in the constitution. It includes all absolute obligations to pay money, or its equivalent, from funds to be provided, as distinguished from money presently available or in process of collection and so treatable as in hand. *Earles v. Wells,* 94 Wis. 285, 68 N. W. 964; *Doon Tp. v. Cummins,* 142 U. S. 366, 376, 12 Sup. Ct. 320."

This court has heretofore consistently held that no state debt is created unless the state itself is under a legally enforceable obligation. *Glendale Development v. Board of Regents* (1960), 12 Wis. 2d 120, 106 N. W. 2d 430; *State ex rel. Thomson v. Giessel* (1955), *supra; State ex rel. Thomson v. Giessel* (1953), *supra; State ex rel. Wisconsin Development Authority v. Dammann, supra.*

Ch. 234, Stats., contains an express negation of the Authority's power to incur state debt or pledge the credit of the state. Sec. 234.14 provides:

". . . The state shall not be liable on notes or bonds of the authority and such notes and bonds shall not be a debt of the state. All notes and bonds of the authority shall contain on the face thereof a statement to such effect."

The initial appropriation of $250,000; sec. 234.19, Stats., which pledges the noninterference of the state in the contractual relationship between the Authority and the holders of its notes and bonds; sec. 234.26, which provides that the state may legally invest any sinking funds, moneys or other funds belonging to it or within its control in any notes or bonds issued by the Authority; and sec. 234.30, which commands all state departments and agencies to extend their full cooperation to the Authority, do not indicate the contracting of state debt as that term has been defined by this court. No absolute obligation is

created to be satisfied or discharged out of future appropriations.

However, sec. 234.15 (4), Stats., directs the governor and the secretary of administration to include in the biennial budget in odd-numbered years the amount certified by the chairman of the Authority as necessary to maintain the Authority's capital reserve fund. The capital reserve fund, among other things, services the payment of the principal and interest of the Authority's notes and bonds. This section further requires the governor to recommend to the legislature in even-numbered years the Authority's additions to the budget for servicing its debt.

Future legislative approval is necessary before appropriations are to be made into the Authority's capital reserve fund. Thus, sec. 234.15, Stats., creates no presently binding legal obligation on the part of the state but merely constitutes an expression of future intention or aspiration.

Other jurisdictions, construing similar legislative acts, have held that provisions similar to sec. 234.15, Stats., are intended only to express to succeeding legislatures an expectation and aspiration that the project might be found worthy of financial assistance, if later needed. *Maine State Housing Authority v. Depositors Trust Co., supra; Massachusetts Housing Finance Agency v. New England Merchants Nat. Bank, supra; In Re Advisory Opinion* (Mich. 1968), *supra; Martin v. Housing Corp., supra.*

It is argued that, despite the express negation of state debt contained in sec. 234.14, Stats., sec. 234.15 creates an expectation of financial assistance from the state to the Authority, and that investors will feel that the state is giving its credit to the Authority even though there is no binding legal obligation on the part of the state.

Similar argument was raised and rejected in *State ex rel. Thomson v. Giessel* (1955), *supra; State ex rel.*

*Thomson v. Giessel* (1953), *supra;* and *State ex rel. Wisconsin Development Authority v. Dammann, supra.* In *State ex rel. Thomson v. Giessel* (1953), *supra,* at page 199, this court stated:

> "Respondent argues that the bond-buying public will feel that the state is giving its credit to the turnpike-corporation bonds even though there is no legal obligation on the part of the state, because it will be reasoned that the state could not afford to allow the project to fail. Obviously, this cannot be the test to be applied. The test of a 'legally enforceable obligation' laid down in the *Wisconsin Development Authority Case, supra,* is the only sound one."

No enforceable legal obligation is created on the part of the state to subsidize the debts of the Authority even though good judgment may dictate that it do so voluntarily. No state debt can be created where payment of state funds is to be made solely at the state's option. *State ex rel. Thomson v. Giessel* (1955), *supra; Burnham v. Milwaukee* (1897), 98 Wis. 128, 73 N. W. 1018.

Respondents contend that ch. 234, Stats., evidences a moral obligation on the part of the state to insure the Authority's debts, and that such moral obligation is sufficient to create state "debt" within the meaning of art. VIII, sec. 4.[21] The term "moral obligations" recognizes the absence of any legally enforceable claim. It is generally held that the state is not compelled to recognize moral obligations, but it is free, through appropriate legislation, to satisfy that which it recognizes as its moral debt.[22] It is stated in 63 Am. Jur. 2d, *Public Funds,* pp. 457, 458, sec. 70:

> "The essence of a moral obligation is that it arises out of a state of facts appealing to a universal sense of justice

---

[21] Expenditures of public funds for a moral obligation may constitute an expenditure for a public purpose. *State ex rel. Holmes v. Krueger* (1955), 271 Wis. 129, 72 N. W. 2d 734; *Will of Heinemann* (1930), 201 Wis. 484, 230 N. W. 698.

[22] 63 Am. Jur. 2d, *Public Funds,* p. 456, sec. 69.

and fairness, even though upon such facts no legally enforceable claim can be based. A 'moral obligation' justifying the enactment of a statute providing for the payment of compensation in a case in which no legal liability exists on the part of the state or its subdivisions is such an obligation as would be recognized by men with a keen sense of honor and with a real desire to act fairly and equitably without compulsion of law. However, it is generally recognized that a moral obligation is more than a mere desire to do charity or to appropriate money in acknowledgment of a gratitude. It is an obligation which, though lacking any foundation cognizable in law, springs from a sense of justice and equity which an honorable person would entertain, but not from a mere sense of doing benevolence or charity."

Even if a moral obligation on the part of the state exists, the fact is that ch. 234, Stats., does not create a legally enforceable claim against the state by the holders of its notes and bonds. Whether future appropriations are made pursuant to sec. 234.15, depends upon the exercise of legislative wisdom of each successive legislative session when and if such requested appropriations are submitted to it for its consideration. Ch. 234 does not create a state debt within the meaning of art. VIII, sec. 4.[23]

Respondents make a similar argument to support their contention that ch. 234, Stats., violates art. VIII, sec. 3. Art. VIII, sec. 3, provides:

". . . The credit of the state shall never be given, or loaned, in aid of any individual, association or corporation."

It has been consistently held by this court that there can be no clash with art. VIII, sec. 3, Wisconsin Constitution, unless the giving of credit results in a legally enforceable obligation against the state. *State ex rel. La Follette v. Reuter* (1967), *supra; State ex rel. Bowman v. Barczak, supra; State ex rel. Thomson v. Giessel*

[23] *See: State ex rel. Atwood v. Johnson, supra,* at page 263.

(1953), *supra.* In *State ex rel. Wisconsin Development Authority v. Dammann, supra,* at pages 196 and 197, this court stated:

"It is argued that the giving or loaning of credit does not necessarily mean the creation of an indebtedness, but includes the holding out of an expectation that payment will be forthcoming and belief or faith that the state will make the disbursement. From this defendant concludes that if plaintiff prevails, it follows that the state has not only loaned its credit but created a legally enforceable indebtedness in violation of sec. 4, art. VIII, Wis. Const. . . .

". . .

"It is our conclusion that the giving or loaning of the credit of the state which it was intended to prohibit by sec. 3, art. VIII, Wis. Const., occurs only when such giving or loaning results in the creation by the state of a legally enforceable obligation on its part to pay to one party an obligation incurred or to be incurred in favor of that party by another party. . . ."

The express negation of the Authority's power to incur debt on behalf of the state or to pledge the state's credit protects the enactment from the alleged violation of art. VIII, sec. 3, Wisconsin Constitution. There is no violation of such constitutional provision unless the giving of credit results in a legally enforceable obligation against the state. Since we have determined that ch. 234 creates no state debt within the meaning of art. VIII, sec. 4, it follows that ch. 234 does not constitute a loan of the state's credit in violation of art. VIII, sec. 3.

*Does sec. 234.30, Stats., compel payment of state funds in violation of art. VIII, sec. 2, Wisconsin Constitution?*

Art. VIII, sec. 2, Wisconsin Constitution, provides:

". . . No money shall be paid out of the treasury except in pursuance of an appropriation by law. . . ."

Sec. 234.30, Stats., provides:

"**Cooperation.** The heads of all departments, boards, councils, committees and commissions in the administrative branch, and the heads of the various divisions, sections and departments thereunder, shall extend their full and unlimited cooperation, including but not limited to the providing of personnel and facilities, to the authority."

Sec. 234.30, Stats., does not contemplate that any moneys shall be paid out of the state treasury to the Authority. Sec. 234.30 authorizes a pledge of state administrative cooperation to the Authority in recognition of its public purpose. Respondents do not contend that the funds appropriated to these various governmental agencies have been made contrary to law or that cooperation with the Authority is in excess of their expressed powers. Although the designated state agencies receive state appropriations, the authorization of their cooperation with the Authority does not constitute an appropriation to the Authority in contravention of art. VIII, sec. 2, Wisconsin Constitution.

*Does ch. 234, Stats., involve the state in "works of internal improvement," in violation of art. VIII, sec. 10, Wisconsin Constitution?*

Art. VIII, sec. 10, Wisconsin Constitution, provides:

". . . The state shall never contract any debt for works of internal improvement, or be a party in carrying on such works; . . ."

We have determined that ch. 234, Stats., does not create a debt in violation of art. VIII, secs. 4 and 7, nor constitute a pledge of the state's credit in violation of art. VIII, sec. 3, nor compel payment of state funds in violation of art. VIII, sec. 2, of the Wisconsin Constitution. The question remains as to whether the provisions of ch. 234 make the state a party in carrying on works of internal improvement within the contemplation of the

Wisconsin Constitution. We are of the opinion it does not.

In resolving this issue, the valid legislative declaration contained in sec. 1 of ch. 287, Laws of 1971, and set forth in detail in our discussion of the issue of public and state-wide purpose is of particular significance.

In summary, this declaration determines that there exists in rural and urban areas of the state a seriously inadequate supply of and a pressing need for safe and sanitary dwelling accommodations for families and persons of low and moderate income, including elderly persons, and those displaced by clearance of slums and blighted areas, and other public programs; that the shortage of such housing is inimical to the safety, health, education, morals and welfare of the residents of the state and the growth and development of its communities, including schools, public transportation, public utilities, sources of employment and service essential to the orderly growth and prosperity of the state and its communities; that present patterns of financing limit the ability of private building and investment industry to produce, without assistance, the needed construction; and that local authorities alone cannot meet this housing need. These legislative determinations are supported by the record.

*State ex rel. Martin v. Giessel, supra,* presented the consideration of a legislative enactment distinctly different from that in the instant case. In *Giessel,* the state appropriated $8,000,000 as a direct grant, paid for from state tax revenues to actually construct housing.

The Michigan Supreme Court, in considering the constitutionality of its act creating a state housing authority, held:

"The act does not authorize the state housing development authority to build buildings. It does not anticipate that the state housing development authority will be a

party to building contracts. It cannot be said then that the state agency will be a party to, nor engaged in carrying on the construction of housing. . . ." *In Re Advisory Opinion re Constitutionality of Public Act 1966,* No. 346, *supra,* 380 Mich. at 582, 158 N. W. 2d at 429.

What was said of the Michigan act is equally true of the Wisconsin Act. *State ex rel. Martin v. Giessel, supra,* related to an enactment considerably different than the instant enactment. It would be an unwarranted bar to legitimate government functions to construe *Giessel* to encompass as an "internal improvement" the activity of the Authority as established by ch. 234, Stats.

The interpretation and application of the internal-improvement restriction of the constitution has always presented difficult questions for this court. While each decision has precedential value, the specific facts then under consideration cannot be ignored. Also, the internal improvement restriction of the constitution has produced several constitutional amendments.[24]

The language of art. VIII, sec. 10, was not intended by the framers of the constitution to prohibit encouragement of all internal improvements. *See State ex rel. Wisconsin Development Authority v. Dammann, supra,* pages 192, 193. In *State ex rel. Jones v. Froehlich* (1902), 115 Wis. 32, 91 N. W. 115, an effort was made to define the term "internal improvement." The intervening years have proved, if nothing else, that the application of an abstract definition of the term has proved difficult. An examination of the cases coming before this court over the last seventy years leads to the conclusion that both this court and the legislature have been cognizant of changing times

---

[24] The constitution has been amended over the years to enable the state to participate in such endeavors as highway construction, ch. 238 [1907]; acquisition and development of forests, ch. 289 [1923]; airport development, J. R. 3 [1945]; and port development, J. R. 15 [1959].

and the ever-changing needs of the state and its people. These cases demonstrate that in considering the application of the internal improvement restriction at least two factors are considered: (1) The dominant governmental function, and (2) the inability of private capital to satisfy the need. *State ex rel. Hammann v. Levitan* (1929), 200 Wis. 271, 228 N. W. 140; *Appeal of Van Dyke* (1935), *supra;* and *State ex rel. La Follette v. Reuter* (1967), *supra.*

In *Appeal of Van Dyke, supra,* a taxpayer attacked the validity of an emergency unemployment relief income tax act. One section of the act permitted reimbursement of 25 percent of the unemployment relief paid by counties or cities for the labor cost of public works. The taxpayer argued, among other things, that the act was unconstitutional since state funds were being used to carry on works of internal improvement. The court, on page 544, stated:

". . . Nor do we consider petitioner's argument sound that ch. 29 violates sec. 10, art. VIII, Wisconsin constitution, which prohibits the state from being a party to carrying on works of internal improvement. It is true that some of the moneys which were paid out by the industrial commission, pursuant to the provision of sec. 2 (2) of the act, which permitted reimbursement to the county or city of twenty-five per cent of the labor cost of public works undertaken to provide for the unemployed, went into such public works, but the primary purpose of the state was not to become a party to carrying on works of internal improvement, but to reimburse the counties and cities which had made work simply for the purpose of providing employment to the unemployed."

The court, having found a public purpose, declared that the carrying on of works of internal improvement was merely incidental thereto or a means to achieve the desired result. Any resulting internal improvement was not the ultimate purpose. In the instant case, the health, safety, and welfare of the people is the dominant pur-

pose of ch. 234, Stats., and the construction of public housing is incidental thereto.

Ch. 614, Laws of 1965, authorized the department of resource development to administer a state program of financial assistance to municipalities for the construction of pollution prevention and abatement facilities. The act was challenged as authorizing the state to engage in the carrying on of works of internal improvements. The court, in *State ex rel. La Follette v. Reuter* (1967), *supra,* held that the purpose of ch. 614 was clearly public and a matter of statewide concern. After quoting the definition of "internal improvements" as stated in *Rippe v. Becker* (1894), 56 Minn. 100, 117, 57 N. W. 331, 335, and quoted in *State ex rel. Owen v. Donald, supra,* and *State ex rel. Thomson v. Giessel, supra,* and citing several cases to show that the pollution of the waters of the state is inimical to public health, the court on page 403, stated:

"We conclude that matters pertaining to the abatement of water pollution are governmental functions of the state of Wisconsin and that water pollution prevention and abatement facilities are not works of internal improvement within the prohibition of sec. 10, art. VIII, Const."

Petitioners allege that the state is made a party to carrying on works of internal improvement because of the initial appropriation of $250,000 to the Authority; sec. 234.15, Stats.; sec. 234.19; and also because sec. 234.30 provides that state agencies shall extend their cooperation to the Authority by providing personnel and facilities. We are of the opinion that underwriting the initial operating costs of the Authority and pledges of cooperation would not involve the state in the financing or construction of public housing; and that such activity on the part of the state constitutes only the encouragement of such activity by others. *State ex rel. Wisconsin Development Authority v. Dammann, supra.*

We have previously determined there is a valid public and state purpose for the enactment of ch. 234, and we

now find and conclude the dominant purpose set forth in the enactment is a valid governmental function and that since private capital is unavailable, therefore, the proposal does not constitute an internal improvement prohibited by art. VIII, sec. 10, Wisconsin Constitution.

*Does sec. 234.28, Stats., grant an unreasonable exemption from taxation in violation of art. VIII, sec. 1, Wisconsin Constitution?*

Sec. 234.28, Stats., provides:

"**Notes and bonds; exemption from taxation.** The state covenants with the purchasers and all subsequent holders and transferees of notes and bonds issued by the authority, in consideration of the acceptance of any payment for the notes and bonds, that its fees, charges, gifts, grants, revenues, receipts and other moneys received or to be received, pledged to pay or secure the payment of such notes or bonds shall at all times be free and exempt from all state, city, county or other taxation provided by the laws of the state."

Respondents argue that sec. 234.28, Stats., gives the Authority advantages which private financial institutions, performing similar functions, do not have. They submit that a tax exemption having this effect is unreasonable and in violation of art. VIII, sec. 1.

Art. VIII, sec. 1, Wisconsin Constitution, in part, provides:

". . . Taxes may also be imposed on incomes, privileges and occupations, which taxes may be graduated and progressive, and reasonable exemptions may be provided."

Any classification of taxation is permissible which has a reasonable relation to a legitimate end of governmental action. *Estate of Miller* (1942), 239 Wis. 551, 558, 2 N. W. 2d 256. In *Welch v. Henry* (1937), 223 Wis. 319, 323, 271 N. W. 68, 277 N. W. 183, this court stated:

". . . while the legislature may classify persons for purposes of taxation, the classification must be based on reasonable differences or distinctions which distinguish the members of a class from those of another in respects germane to some general and public purpose or object of the particular legislation. *Louisville Gas & Electric Co. v. Coleman,* 277 U. S. 32, 48 Sup. Ct. 423. . . ."

The legislative findings, which are supported by facts as set forth in the stipulation of facts, reflect that there exists in Wisconsin a serious shortage of safe and sanitary residential housing for persons and families of low and moderate income, and that private enterprise and investment have not been able to produce, without assistance, this needed residential housing. The Authority was established by the legislature as a public body corporate and politic, whose purpose, absent any profit motive, is to alleviate this condition. Ch. 234, Stats., provides that the Authority shall respond to this serious public need, without encroachment on private enterprise, by restricting the power of the Authority to act only upon the determination that financing is not otherwise available from private lenders upon reasonably equivalent terms and conditions. The Authority is acting in all respects for the benefit of the people of this state in the performance of essential public functions and serves a public purpose in improving and otherwise promoting their health, welfare and prosperity.

The tax exemption provided by sec. 234.28, Stats., is intended to encourage favorable sale of the Authority's bonds and notes and thereby contribute substantially to the accomplishment of the public purpose for which they were issued. The tax exemption provided by sec. 234.28 is reasonable and sec. 234.28 is not in violation of art. VIII, sec. 1.

*Does ch. 234, Stats., delegate legislative authority in violation of art. IV, sec. 1, Wisconsin Constitution?*

Art. IV, sec. 1, Wisconsin Constitution, provides:

". . . The legislative power shall be vested in a senate and assembly."

In *State ex rel. Wisconsin Inspection Bureau v. Whitman* (1928), 196 Wis. 472, 505, 220 N. W. 929, the rule was established as follows:

". . . The power to declare whether or not there shall be a law; to determine the general purpose or policy to be achieved by the law; to fix the limits within which the law shall operate,—is a power which is vested by our constitutions in the legislature and may not be delegated. When, however, the legislature has laid down these fundamentals of a law, it may delegate to administrative agencies the authority to exercise such legislative power as is necessary to carry into effect the general legislative purpose . . . ." *See also: Olson v. State Conservation Comm.* (1940), 235 Wis. 473, 293 N. W. 262; *Clintonville Transfer Line v. Public Service Comm.* (1945), 248 Wis. 59, 21 N. W. 2d 5; *United Gas, Coke & Chemical Workers v. Wisconsin Employment Relations Board* (1949), 255 Wis. 154, 38 N. W. 2d 692.[25]

In *Milwaukee v. Sewerage Comm.* (1954), 268 Wis. 342, 351, 67 N. W. 2d 624, this court stated:

". . . The true test and distinction whether a power is strictly legislative, or whether it is administrative and merely relates to the execution of the statutory law, is between the delegation of power to make the law, which

---

[25] Rule cited in *West Milwaukee v. Area Board Vocational, Technical & Adult Education* (1971), 51 Wis. 2d 356, 372, 187 N. W. 2d 387; *Watchmaking Examining Board v. Husar* (1971), 49 Wis. 2d 526, 534, 182 N. W. 2d 257; *Schmidt v. Local Affairs & Development Dept.* (1968), 39 Wis. 2d 46, 59, 158 N. W. 2d 306; *State ex rel. Thomson v. Giessel, supra,* 265 Wis. at page 190.

necessarily involves a discretion as to what it shall be, and conferring authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done. To the latter, no valid objection can be made. *State ex rel. Adams v. Burdge* (1897), 95 Wis. 390, 70 N. W. 347; *State ex rel. Buell v. Frear* (1911), 146 Wis. 291, 131 N. W. 832. . . ."

In *State ex rel. La Follette v. Reuter, supra,* at 33 Wis. 2d 394, this court citing *State ex rel. Thomson v. Giessel* (1953), *supra,* which quoted *People ex rel. Curren v. Schommer* (1945), 392 Ill. 17, 24, 63 N. E. 2d 744, stated:

" ' ". . . it has long been accepted that the legislature may delegate that reasonable measure of authority which is necessary to accomplish the constitutional purpose desired. We hardly see how . . . it can be said that the legislature, which is the voice of the people, has no freedom of action in determining the best methods of giving to the public that service for which it is willing and able to pay. It is the best judge of what is necessary to meet the needs of the public and in what manner the service shall be directed. . . ." ' "

The power delegated to the Authority by ch. 234, Stats., authorizes the Authority to act in such a way as will assist in the development and construction of housing for low and moderate income families and persons and in the elimination of substandard housing conditions in the state of Wisconsin. The legislature has declared that there shall be a law and has determined the general policy sought to be achieved. The Authority must act within the limits as expressed by the purpose of ch. 234. Such a standard has been held sufficient to protect legislative enactments from attacks based upon alleged delegation of legislative power.[26] A similar grant of power was

---

[26] *See: Olson v. State Conservation Comm., supra,* page 482. Also, delegations of authority to determine what constitutes a "blighted" or "substandard" area, the parties to which the ac-

upheld in *Jolly v. Greendale Housing Authority* (1951), 259 Wis. 407, 49 N. W. 2d 191. The court, at page 409, stated:

"The purpose of sec. 66.40, Stats., the 'Housing Authorities Law,' is stated in sub. (2). It is there declared, in substance, that there exist insanitary and unsafe dwelling accommodations resulting in a shortage of safe or sanitary dwelling accommodations for persons of low income, forcing them to occupy overcrowded and congested dwelling accommodations; that these circumstances cause conditions not conducive to the public welfare and safety; and that the construction of housing projects for such persons and the clearing and reconstruction of the areas in which such unsatisfactory conditions exist and the providing of safe and sanitary dwelling accommodations for them are public uses and purposes for which public money may be spent.

"By sub. (9), sec. 66.40, Stats., the Authority, the corporation established to function as the agency to administer the law, is granted the 'powers necessary or convenient to carry out and effectuate the purposes and provisions of' the law.

"Thus the act does not grant unlimited authority to engage in the housing business regardless of the nature, character, or purpose of the venture. It is only when the purpose of the law is to be effectuated that the Authority may proceed."

The court in *New Jersey Mortgage Finance Agency v. McCrane* (1970), 56 N. J. 414, 426, 267 Atl. 2d 24, observed that:

". . . the necessities of modern government have increasingly dictated the use of general rather than minutely detailed standards in regulatory enactments under the police power. . . ."

quired land is to be sold or leased, and the terms of the transfer has been held quite generally in various urban redevelopment laws, not to constitute an illegal delegation of authority. Annot. (1955), *Urban Redevelopment Laws*, 44 A. L. R. 2d 1414, 1427.

Necessarily the Authority must determine what persons or families are to receive its assistance and through what vehicles this assistance may be more expeditiously provided.

The legislature, by enacting sec. 234.01 (8), Stats.,[27] has provided that the recipients of financial aid shall be "persons and families of low and moderate income."

The Authority is not delegated the power to make law but to make factual determinations in execution of the law as declared by the legislature.

An argument similar to that of respondents' was rejected in *Martin v. Housing Corp., supra.* The North Carolina Supreme Court, at 277 N. C. at 55, 175 S. E. 2d 680, stated:

"The clear and declared purpose of the General Assembly is to provide 'residential housing' for 'persons and families of lower income.' Necessarily the Corporation must determine what persons and what families are to receive its assistance.

"The General Assembly, in Section 3 (11) of the 1969 Act, provided: ' "(P)ersons and families of lower income" means persons and families deemed by the Corporation to require such assistance as is made available by this Act on account of insufficient personal or family income, taking into consideration without limitation, such factors as (a) the amount of the total income of such persons and families available for housing needs, (b) the size of the family, (c) the cost and condition of housing facilities available, (d) the eligibility of such persons and families for federal housing assistance of any type predicated upon a lower income basis, and (e) the ability of such persons and families to compete successfully in the normal housing market and to pay the amounts at which private enterprise is providing decent, safe and sanitary housing, and deemed by the Corporation therefore to be eligible to occupy residential housing

[27] *See* footnote 3.

constructed and financed, wholly or in part, with insured construction loans or insured mortgages, or with other public or private assistance.'

"We are of the opinion and hold that the Corporation does not legislate but determines factually, by application of the factors the General Assembly has prescribed, what persons or families are 'persons and families of lower income' and therefore entitled to the benefits of the 1969 Act." [28]

Respondents contend that the term "eligible sponsor," as defined in sec. 234.01 (3), Stats.,[29] is so inadequately defined as to grant to the Authority unlimited power in determining who are to be the recipients of construction and long-term mortgage loans under sec. 234.04, and grants under sec. 234.06.

The terms "housing corporation," "limited-profit entity," and "nonprofit corporation" are defined in sec. 234.01 (4), (6) and (7), Stats.,[30] respectively. The term "any other entity," contained in sec. 234.01 (3), must be read in conjunction with the declared purpose of the legislation. The Authority has not been delegated the power to make law but only to exercise the discretion necessary to effectuate its goals as delineated by the legislature. The court, in *Martin v. Housing Corp., supra,* at 277 N. C. 56, 175 S. E. 2d 681, after determining that the establishment of the North Carolina Housing

---

[28] Almost identical legislation was upheld against similar attack in *State ex rel. West Virginia Housing Development Fund v. Copenhaver* (1969), 153 W. Va. 636, 650, 171 S. E. 2d 545. The court therein stated: "The legislature enacted the law here in question and has not delegated to the Fund any purely legislative authority. It has, perhaps as a matter of absolute necessity, clothed the Fund with a power and duty, in a limited area, to exercise a degree of discretion or judgment in determining who are 'persons and families of low and moderate income.' . . ."

[29] *See* footnote 3.

[30] *See* footnote 3.

Corporation [31] was not unconstitutional as an illegal delegation of legislative authority, stated:

". . . Obviously, the Corporation must exercise its discretion and judgment with reference to the choice of sites and the identity of the sponsor, builder or developer with whom the Corporation will deal in connection with a particular project. . . ."

Respondents argue that there is nothing in the law to prevent the private lending institutions from turning the program to their own profit at the expense of the intended recipients. The Authority must exercise its discretion so that the loans are so distributed as to meet the housing shortage in accordance with the legislative direction. Should the factual considerations underlying ch. 234, Stats., cease to exist or should the Authority undertake action in excess of the power conferred upon it by ch. 234, a remedy through judicial proceeding would then be available.

After considering all of the contentions advanced by the respondents, we are of the opinion that ch. 234, Stats., does not empower the Authority to act in the capacity of lawmaker. The act places in it a discretionary authority to implement the statutory direction within the boundaries fixed by the enactment. This endowment of discretion is necessary and essential to achieve a valid governmental objective as declared by the legislature and does not constitute an illegal delegation of legislative authority.

*Does ch. 234, Stats., grant corporate powers and privileges by special or private law in violation of art. IV, secs. 31 and 32, Wisconsin Constitution?*

Art. IV, sec. 31, Wisconsin Constitution, in part provides:

---

[31] Ch. 1235, Session Laws of 1969.

". . . The legislature is prohibited from enacting any special or private laws in the following cases:

". . .

"7th. For granting corporate powers or privileges, except to cities."

Art. IV, sec. 32, Wisconsin Constitution, provides:

". . . The legislature shall provide general laws for the transaction of any business that may be prohibited by section thirty-one of this article, and all such laws shall be uniform in their operation throughout the state."

Respondents direct our attention to *State ex rel. Church Mut. Ins. Co. v. Cheek* (1890), 77 Wis. 284, 46 N. W. 163, which held unconstitutional a statute authorizing members of the Methodist Episcopal Church to organize a corporation to insure church and parsonage properties owned by said denomination as contravening the provisions of paragraph 7, sec. 31, art. IV. The statute was held to be a special or private law in that the object of the act was to authorize the incorporation and organization of only one corporation.[32]

The Authority, denominated a public body corporate and politic, is granted only those powers "necessary or convenient" to implement the purposes of ch. 234, Stats. It was not the intention of the legislature to create a corporation in the ordinary sense. Ch. 234 grants to the Authority those corporate powers essential to its performance in improving and otherwise promoting the health, welfare and prosperity of the people of this state.

In *State ex rel. La Follette v. Reuter* (1967), 36 Wis. 2d 96, 112, 113, 153 N. W. 2d 49, this court interpreted

---

[32] *State ex rel. Church Mut. Ins. Co. v. Cheek, supra,* cited in *State ex rel. Bowman v. Barczak, supra,* page 75; *State ex rel. Thomson v. Giessel* (1954), *supra; State ex rel. Thomson v. Giessel* (1953), *supra.*

art. IV, sec. 31, Wisconsin Constitution, in the following
manner:

"*Kimball v. Rosendale* (1877), 42 Wis. 407, 415, dis-
cussed the original constitutional amendment of 1871
which became art. IV, sec. 31, of our constitution:

" 'It is impossible to mistake the object or spirit of this
amendment. For years, the statute books had been en-
cumbered with multitudinous acts of the several kinds
prohibited; vicious not only in quantity but in quality.
In some of the instances prohibited, they meddled in
purely private matters; authorizing what might be done
without the authority or with judicial authority. In
other instances, they conferred special authority in cases
within general authority. And in all instances relating
to things *publici juris,* they broke the uniformity and
harmony of law so essential to good government; sub-
stituting special for general rules, and rendering a large
body of the municipal law fragmentary in character,
and different by locality. After long endurance of such
excesses of legislation, the amendment of 1871 was
adopted; in order, so far as it went, to confine legisla-
tion to its legitimate objects, to substitute general for
special enactments, and to restore order and uniformity
to municipal law. And we cannot doubt that, except so
far as power over any of the nine several subjects is
reserved by other provisions of the constitution, the
amendment was intended to withdraw them, and does
effectually withdraw them, from any exercise of legisla-
tive authority over them, by private or special stat-
utes. . . .'

"In determining the constitutionality of a particular
statute, as it relates to this section of the constitution,
the courts have been motivated by such polar factors
as curing the abuses which prompted the original 1871
amendment and the overwhelming desirability of the par-
ticular statute then under consideration.

" . . .

"The purpose of this constitutional provision is to
insure that legislation will promote the general welfare
and further statewide interests, as opposed to private con-
cerns. . . ."

Art. IV, sec. 31, Wisconsin Constitution, was not meant to deny the legislature the authority to grant limited corporate powers to the entities it creates to promote a public and state purpose. Ch. 234, Stats., does not involve the promotion of private or local interests, as condemned by the framers of sec. 31, but a legitimate governmental and statewide purpose as declared by the legislature. Ch. 234 is not objectionable as either a special or private law.

*Is sec. 234.15, Stats., unconstitutional as an encroachment upon the power granted to the governor by art. V, secs. 4 and 10, Wisconsin Constitution?*

Sec. 234.15 (4), Stats., in part, provides:

"(a) . . . in each even-numbered year . . . . The governor and the secretary of administration shall include in the biennial budget of the immediately succeeding odd-numbered year the amount so certified by the chairman of the authority.

"(b) In each odd-numbered year, . . . The governor shall, in the immediately succeeding even-numbered year, include this amount in his recommendations, in bill form, to the joint committee on finance for introduction without change in either house."

The legislature cannot interfere with, or exercise any powers properly belonging to the executive department.[33] This court in *State ex rel. Broughton v. Zimmerman* (1952), 261 Wis. 398, 404, 405, 52 N. W. 2d 903, stated:

"The Wisconsin constitution is modeled after that of the United States constitution in that it provides for three separate co-ordinate departments of government, the legislative, executive, and judicial. That which the Illinois supreme court declared in *Fergus v. Marks* (1926), 321 Ill. 510, 514, 152 N. E. 557, 46 A. L. R. 960, with respect

---

[33] *See:* 16 C. J. S., *Constitutional Law*, p. 545, sec. 130.

to the sphere and function of each of the three independent departments of the government in the state of Illinois applies with equal force to our situation in Wisconsin. In that case the Illinois court stated:

" 'Neither of these three departments is subordinate to or may exercise any control over another except as is provided by the constitution. Their status is that of equality, each acting within its own sphere independent of each of the others, so long as its action does not exceed the powers confided to it, unless particular exceptions are made to this general rule by the constitution itself. (*People v. Bissell,* 19 Ill. 229, 68 Am. Dec. 591.) The legislative department determines what the law shall be, the executive department executes or administers the law, and the judicial department construes and applies the law. Neither one of these departments can arrogate to itself any control over either one of the other departments in matters which have been solely confided by the constitution to such other department. The power to enact statutes is, clearly, solely a legislative power confided by the constitution to the legislature. The power to construe statutes is confided to the judiciary.'

"In *Goodland v. Zimmerman* (1943), 243 Wis. 459, 466, 467, 10 N. W. (2d) 180, this court stated these same principles as follows:

" 'It must always be remembered that one of the fundamental principles of the American constitutional system is that governmental powers are divided among the three departments of government, the legislative, the executive, and judicial, and that each of these departments is separate and independent from the others except as otherwise provided by the constitution. . . . While the legislature in the exercise of its constitutional powers is supreme in its particular field, it may not exercise the power committed by the constitution to one of the other departments.'"

Art. V, sec. 4, Wisconsin Constitution, provides that the governor "shall communicate to the legislature, at every session, the condition of the state, and recommend such matters to them for their consideration as he may deem expedient." Whatever recommendations the governor chooses to make to the legislature relating to appropria-

tions are constitutionally committed to his discretion. In *The Attorney General ex rel. Taylor v. Brown* (1853), 1 Wis. 442, 449 (*513, *522), this court stated:

"The policy of our constitution and laws has assigned to the different departments of the state government, distinct and different duties, in the performance of which, it is intended that they shall be entirely independent of each other; so that whatever power or duty is expressly given to, or imposed upon the executive department, is altogether free from the interference of the other branches of the government. Especially is this the case, where the subject is committed to the *discretion* of the chief executive officer, either by the constitution or by the laws. So long as the power is vested in him, it is to be by him exercised, and no other branch of the government can control its exercise."

While the legislature has a legitimate interest in keeping itself apprised of the activities of the Authority, it cannot do so in a manner that interferes or precludes the exercise of constitutionally conferred executive power. Sec. 234.15 (4), Stats., encroaches upon the exercise of the governor's power to make what recommendations he may in his discretion. That part of sec. 234.15 (4) which requires the governor to include in the biennial budget or in his recommendations to the joint committee on finance the amount certified by the chairman of the Authority as necessary to restore the capital reserve fund to an amount equal to the capital reserve fund requirement, is declared unconstitutional and void.

Also, sec. 234.15 (4) (b), Stats., purports to require the joint finance committee of succeeding legislatures to introduce in bill form, and without change in either house, a specific appropriation for the capital reserve fund recommended by the governor. Such a legislative enactment is, in fact, a nullity. It cannot have and does not have the effect of any limitation whatever upon the deliberations and actions of the joint finance committee in subsequent legislative sessions.

*By the Court.*—Declaratory judgment granted adjudging that ch. 287, sections 2 and 3, Laws of 1971, creating ch. 234, Stats., and the Wisconsin Housing Finance Corporation, is a valid enactment, except that sec. 234.15 (4) (a), (b) is an unconstitutional encroachment upon the power granted to the governor by art. V, sec. 4, Wisconsin Constitution; and the direction to the joint finance committee of succeeding legislatures contained in sec. 234.15 (4) (b) is declared a nullity.