JAMES A. JUNG, Executive Secretary Wisconsin Higher EducationalAids Board
On behalf of the Higher Educational Aids Board (Board), you ask a number of questions concerning the legal relationship between the Board and the Wisconsin Higher Education Corporation (the Corporation) with respect to the administration of the Wisconsin guaranteed student loan program.
Before addressing your specific questions, it is useful to review the general background of the program. Chapter 39, Stats., provides for a federally guaranteed student loan program in Wisconsin including the state as a lender. The student loans are financed both by private lenders and by state revenue obligation bonds issued by the Wisconsin State Building Commission. The state bonds are exclusively secured by guaranteed student loan revenues. No state credit is pledged.
In order for the program to provide sufficient safety and security to induce private lenders and revenue bond investors, it is necessary to guarantee the student loans. The basic guarantee is furnished by the Corporation whose guarantee obligation is in turn reinsured by the United States Department of Education pursuant to the Higher Education Act, 20 U.S.C. § 1071, etseq. The federal reinsurance agreement provides a conditional federal guarantee ranging from eighty to one hundred percent depending on the annual claims rate. The balance of the guarantee to lenders comes from an insurance reserve fund maintained by the guarantor corporation. *Page 136 
Each state participating in the federal program must designate a guarantee agency to administer the various collection and insurance obligations mandated by federal law. The guarantee agency may be a state government agency or a private nonprofit corporation organized for that purpose. Wisconsin elected the latter option to avoid constitutional problems attendant to public assumption of private debt obligations. Accordingly, under section 39.33(1), the Board is authorized to organize and maintain a non-stock corporation under chapter 181 to provide for a guaranteed student loan program. The Wisconsin Higher Education Corporation was organized under that statute. At the present time the Corporation has no employes. Some, but not all, of its corporate directors are also members of the Board. Administrative services required by the Corporation are furnished by Board employes pursuant to a contract entered into under section39.33(2) on February 4, 1977. The Corporation reimburses the Board in full for such services and facilities. The functions of the Corporation, among others, are granting underwriting approval to student loans, collecting delinquent loans and maintaining the corporation reserve fund.
The Corporation's duties are defined further in a complex set of agreements made between the Board, the Building Commission, the Corporation and the revenue obligation bond trustee. In particular, the corporation reserve agreement entered into by the Building Commission, the Board and the Corporation on July 13, 1978, which generally relates to the maintenance of a reserve fund for the guarantee of outstanding student loans financed under the revenue obligation bonds, also provides that:
 The state agrees that in accordance with section 39.33 of the statutes at all times when bonds shall be outstanding the board shall provide administrative services to the corporation and the corporation agrees to pay the state therefor.
The reserve agreement is intended to cover all student loans insured by the Corporation whether financed through revenue bonds or other private sources. Thus, the services furnished to the Corporation by the Board extend to servicing all such loans. Specifically, the agreement recognizes that:
 The ability of the corporation to fulfill its obligations to the state on the contract of student loan insurance depends directly *Page 137 
upon the maintenance of adequate amounts in the corporation's guarantee fund, which is available not only to fulfill insurance or guarantee obligations to the state under the contract of student loan insurance but also similar obligations to other lenders upon student loans . . . .
It is my understanding that at the present time the Corporation insures approximately $700,000,000 worth of student loans, of which about $566,000,000 are loans made by private lending institutions.
In addition, the state has covenanted with the bondholders that so long as the bonds are outstanding and unpaid, the state will maintain the corporation reserve agreement in full force. Failure to maintain the reserve agreement could result in a declaration of default under the revenue bond agreement. Other pertinent facts will be referred to in the answers to your specific questions.
 1. Can the state control and/or direct the scope and level of administrative services of the Corporation?
 2. Can the state control the number and level of employes available to collect corporate debts or to provide other administrative services associated with the guaranteed student loan program?
The brief answer to your first question is "no." The answer to your second question is a qualified "yes" in that the state may control the number and level of Board employes but only to the extent that such control does not cause a default of the revenue obligation bond agreement or impairment of existing contractual obligations.
Section 39.33(2) provides:
 The board may provide administrative services for the nonstock corporation with which the board has entered into a contractual agreement for purposes of providing for a guaranteed student loan program in the State. Services provided under this section shall be in accordance with the decision of the board as to the type and scope of services requested and the civil service range of any employe assigned to them. *Page 138 
It should be understood that the Corporation is a private corporation having a legal existence independent from the state or any of its agencies. See OAG 36-82 (Unpublished Opinion, May 7, 1982). Since the Corporation is duly established as a private corporation under chapter 181, it is unlike an authority that is created as a body politic whose internal operations the Legislature may closely regulate. See, e.g., State ex rel.Nusbaum v. Warren, 59 Wis.2d 391, 208 N.W.2d 780 (1973) (dealing with the Wisconsin Housing Finance Authority under chapter 234). Instead of creating an authority, the Legislature chose to empower the Board to organize a private corporation. In making this choice, future operations of the Corporation became subject to the provision of our constitution forbidding special or private laws respecting "corporate powers or privileges." Wis. Const. art. IV, § 31. In the case of corporations, the Legislature must enact "general laws for the transaction of any business . . . and all such laws shall be uniform in their operation throughout the state." Wis. Const. art. IV, § 32. The purposes of these constitutional provisions were to foreclose enactments which "`"meddled in purely private matters"'" and to "`"substitute general for special enactments."'" State ex rel. LaFollette v. Reuter, 36 Wis.2d 96, 112, 113, 153 N.W.2d 49
(1967). Consequently, the Legislature could not single out the Corporation for special enactments concerning its internal affairs, as though it were an authority, but of course the Corporation is subject to general laws that are uniform throughout the state.
As an independent and private corporation, therefore, the Corporation has the authority and duty to determine what services are needed to carry out its contractual obligations to the United States Department of Education and to the various lenders which it serves. The statute contemplates that the Board may contract with the Corporation to furnish the necessary personnel and facilities to the Corporation at the Corporation's expense. Thus, the Board has the authority to decide how many employes will be needed and from which of the established civil service classifications they will be drawn. However, as a state agency, the Board is subject to the statutes and rules governing the state civil service. The Board cannot independently create new civil service classifications nor can it exceed the number of positions authorized and allocated to it in the legislative budget process. *Page 139 
Ordinarily this contractual arrangement ought not present any problems. The Corporation will determine what needs to be done and call upon the Board to do it. As long as the services and facilities are adequate to the task, the Corporation should have no particular interest in the Board's personnel and budget policies and practices. However, if the Board should be restricted in its ability to furnish the necessary facilities and services, whether by legislative act or by the decision of other administrative agencies, and if such restrictions materially impair the capability of the Corporation to fulfill its obligations, then the state might very well face the specter of defaulting on its revenue obligation bond agreement.
Viewed another way, the state's inherent power to create, alter, abolish or control its administrative agencies has been affected substantially by its covenants with revenue bondholders. As noted above, the state through the Building Commission has promised that it will maintain the corporate reserve agreement for as long as the revenue bonds are outstanding. This covenant is directly related to the security afforded the bondholders. The Corporation's ability to carry out its overall insurance obligations in an efficient and effective manner is crucial not only to the maintenance of bondholder security, but also to the marketability of the revenue bonds themselves. The bond trustee has, on behalf of the bondholders, the right to enforce those provisions of the corporation reserve agreement requiring the continued maintenance of the purchase of service agreement between the Corporation and the Board. Any legislative action that either abolishes that contractual relationship or materially inhibits the Board's ability to provide the Corporation with the services it requires may constitute an impairment of a contractual obligation in violation of the Contract Clause of the United States Constitution. U.S. Const. art. I, § 10, cl. 1. This is not to say that the Legislature is prohibited from making any laws affecting the Higher Educational Aids Board. However, the point at which any legislative act materially impairs a contract depends upon the particular facts involved.
A review of recent Contract Clause cases is instructive but not altogether dispositive on this point. In United States Trust Co.v. New Jersey, 431 U.S. 1 (1977), the United States Supreme Court considered the question of how to balance a state legislature's inherent powers against the restrictions placed on the legislative power *Page 140 
under the Contract Clause. In that case, the States of New York and New Jersey joined in an interstate compact to create a port authority to operate a number of public transportation facilities. The states had enacted laws that limited the port authority's ability to subsidize rail passenger services from revenues and reserves generated from other port authority operations. That restriction was incorporated into covenants in resolutions covering bonds issued by the port authority to finance its activities. Those bonds were secured by a pledge of the general reserve fund.
In 1974, the two states repealed the restrictions on the use of money in the general reserve fund for subsidizing of rail passenger services. The bond trustee brought an action against the states on behalf of the bondholders. The trustee was concerned that rail passenger subsidies might draw down the reserve fund securing the bonds, thereby imperiling bondholder security and the marketability of the bonds.
The Supreme Court held that the states' repeal of the restrictions violated the Contract Clause. The Court noted that more than a technical impairment is required before it becomes necessary to resolve the police power-contract clause question. Thus, impairment is ultimately an issue of fact. The Court also recognized that its previous decisions had affirmed the power of the respective states to use their police power to regulate for the benefit of the public health and welfare even when the exercise of that power affected existing contractual obligations. The Court observed: "In short, the Contract Clause does not require a State to adhere to a contract that surrenders an essential attribute of its sovereignty." Id. at 23.
Nevertheless, in ruling for the bondholders, the Court said:
 In deciding whether a State's contract was invalid ab initio under the reserved-powers doctrine, earlier decisions relied on distinctions among the various powers of the State. Thus, the police power and the power of eminent domain were among those that could not be "contracted away," but the State could bind itself in the future exercise of the taxing and spending powers. Such formalistic distinctions perhaps cannot be dispositive, but they contain an important element of truth. Whatever the propriety of a State's binding itself to a future course of conduct in other contexts, the power to enter into effective financial contracts cannot *Page 141 
be questioned. Any financial obligation could be regarded in theory as a relinquishment of the State's spending power, since the money spent to repay debts is not available for other purposes. Similarly, the taxing power may have to be exercised if debts are to be repaid. Notwithstanding these effects, the Court has regularly held that the States are bound by their debt contracts.
 The instant case involves a financial obligation and thus as a threshold matter may not be said automatically to fall within the reserved powers that cannot be contracted away.
Id. at 23-24 (footnotes omitted).
Of course, there are some factual differences in the covenants involved in United States Trust Co. and those in the Wisconsin revenue obligation bonds. While in both instances the covenants are related to security of bondholders, the United States TrustCo. covenants were solely financial in nature. The Supreme Court commented on that distinction:
 Not every security provision, however, is necessarily financial. For example, a revenue bond might be secured by the State's promise to continue operating the facility in question; yet such a promise surely could not validly be construed to bind the State never to close the facility for health or safety reasons. The security provision at issue here, however, is different: The States promised that revenues and reserves securing the bonds would not be depleted by the Port Authority's operation of deficit-producing passenger railroads beyond the levels of "permitted deficits." Such a promise is purely financial and thus not necessarily a compromise of the State's reserved powers.
Id. at 25 (emphasis added).
In this instance the state has not agreed to pay the bonded indebtedness. The agreement that provides services to the Corporation is not purely financial in nature. Therefore, the extent to which the Legislature may control the Board's activities under that service agreement is a much closer one than presented in the United States Trust Co. decision. The line is difficult to draw and I cannot predict with any assurance when the line is crossed. It suffices to say at this point that the most prudent course is to recognize the independence *Page 142 
of the Corporation and to take whatever steps are reasonably necessary to equip the Board with sufficient personnel and facilities to enable it to provide the Corporation with the services it requires.
 3. Can the state assume the Corporation's duty to manage and collect debt?
The Corporation is contractually obligated to collect delinquent student loans. This function is clearly within the powers conferred upon the Corporation under chapter 181. Thus, any attempt to abrogate those powers or otherwise transfer the Corporation's obligations to the state would more than likely be a violation of the Contract Clause. It must be remembered that the Corporation has agreed to insure and manage hundreds of millions of dollars of private debt. The private lenders have certain contractual rights that are enforceable against the Corporation alone. The state may not impair those existing contractual obligations.
In addition, the state is prohibited from giving its own credit in aid of any private individual, association or corporation. Wis. Const. art. VIII, § 3. Thus, to the extent that any state assumption of the loan collection function would obligate the state to insure the private student loans, that constitutional restriction would be violated.
Lastly, as noted in the answer to your first question, a legislative act directed toward controlling the powers and duties of an individual corporation, the Wisconsin Higher Education Corporation in this instance, may run afoul of the constitutional prohibition against the enactment of special or private bills granting corporate powers or privileges. Wis. Const. art IV, § 31, cl. 7. However, the Legislature retains the power of enacting general laws governing corporations providing those laws operate uniformly throughout the state. Wis. Const. art. IV, § 32.
Therefore, it is my opinion that the state may not assume the Corporation's duty to manage and collect debts incurred under the state guaranteed loan program.
 4. Does the contract [between the Board and the Corporation] empower the Corporation to determine the scope and level of administrative services purchased from the State? *Page 143 
As stated in my answer to your first two questions, the Corporation has the authority and duty to determine what needs to be done in order to carry out its contractual obligations. For example, it may decide that it needs the capability of servicing its delinquent loan accounts within a specified time period. Under the Corporation-Board service agreement, the Corporation makes its needs known to the Board. The Board, in turn, must decide what personnel and facilities are required to perform that service. Of course, the Corporation is not precluded from making its recommendations on how the job might be best performed. But in the final analysis, the decision rests with the Board. For example, the Corporation may recommend but cannot require the purchase or rental of some particular data processing facility or the hiring of personnel. The key is actual performance; if the Board gets the job done satisfactorily and on time, the Corporation has no need to be concerned about how the Board does it.
In this regard, I note that the Corporation-Board service agreement appears to be inconsistent with the language of the statute as construed in this opinion. The agreement states:
 In consideration for the agreement of the corporation to pay for the provision of administrative services, the board hereby agrees to furnish to the corporation all administrative services reasonably required for the operation of the guaranteed student loan program. The type and scope of such services shall be determined from time to time by the corporation.
(Emphasis added.)
The italicized language gives to the Corporation precisely what section 39.33(2) confers on the Board, namely, the authority to determine the type and scope of services to be furnished under the agreement. However, in my opinion, this apparent conflict can be resolved by construing the contract to mean that the Corporation retains the power to decide what services it needs and the Board may, in accordance with the statute, determine how it will provide those services. Consequently, to the extent that the agreement is capable of such construction, it is not in violation of the statute. It is my understanding that when this agreement was made the Board membership and the Corporation directorship were virtually identical. Therefore, the apparent conflict between the agreement and the *Page 144 
statute as a practical matter may be viewed as a distinction without a difference. However, in light of the changes in the composition of the Corporation's directorship, and the increasing recognition of the independence of the Corporation, the interpretation of the agreement in this opinion should be followed scrupulously by both parties. In addition, it might be advisable to amend the agreement to eliminate any ambiguity on this point.
 5. What recourse does the Corporation have if the state fails to provide requested services?
As I emphasized in my answer to the previous questions, the Corporation is an independent legal entity having substantial obligations to the United States government and various lending institutions. If in the Corporation's judgment the Board fails to provide the services needed to fulfill its corporate obligations, the Corporation is in a position to decide whether it should obtain those services by other means, either through the hiring of its own staff or by contracting with another party.
This alternative is not without its difficulties, however. It is my understanding that the revenue bondholder trustee's approval of such an arrangement is probably necessary in order to avoid default. Moreover, the total abnegation of the service agreement would constitute an impairment of the corporate reserve agreement covenant requiring the Board to furnish services to the Corporation as long as any revenue bonds are outstanding.
In my opinion, it might be possible to avoid those problems to some extent by recognizing that neither the statute nor the corporate reserve agreement nor the Corporation-Board service agreement provides that the Corporation must acquire its services exclusively from the Board. The statute is permissive in that it authorizes but does not require the Board to contract with the Corporation. Also, the covenants merely contemplate the maintenance of a contractual relationship in which the Board will remain ready and willing to furnish the services within the limits of its capability. It would seem unreasonable that the Legislature and the bondholder trustee would have decided that a particular agency would always have the ability to accomplish any task the Corporation might require. Thus, a corporate decision to supplement the Board's service by other means *Page 145 
could, under some circumstances, be altogether consistent with the statute and the relevant agreements.
In conclusion, the tenor of your questions reflect the growing concern shared by the public, the Legislature and the financial community about the continued vitality of the state's guaranteed student loan program. Some of this concern may be the result of misapprehension of the legal and factual relationship between the Wisconsin Higher Education Corporation and the state. While both parties are engaged in a program of substantial public importance and share many common goals, the Corporation's independent authority and obligations cannot be overlooked.
Ideally, the surest way to avoid potential default on the revenue bond obligations is to recognize the independence and the distinctiveness of each of the parties to the program while at the same time making every reasonable effort to keep the existing relationships in place. It seems to me that the public is best served if the Corporation pursues its objective vigorously and the state makes a conscientious effort to equip the Board with sufficient facilities and personnel to fill the Corporation's needs.
As noted above, other arrangements may be possible. The state might lawfully exert more control over the Board's administrative judgments. The Corporation may even be able to look elsewhere for services. But all of these alternatives present difficulties. Where the line drawn by the respective covenants is crossed depends upon the facts of the particular case. I am unable to provide specific guidance in this regard given the information before me. However, the key is performance. If the Corporation performs its insurance obligations as it has promised, security of the student loan lenders and the bondholders will be assured and the public's interest in the continued maintenance of a viable student loan program will be served.
BCL:DSF