JAMES R. KLAUSER, Secretary Department of Administration
You have posed four questions which together ask whether the state can contract public debt to finance its contributions to the proposed Great Lakes Protection Fund (the "Fund"), a permanent endowment of $100 million to "ensure the continuous development of needed scientific information, new cleanup technologies and innovative methods of attacking pollution problems" contemplated by the governors of the Great Lakes states. Specifically, you ask the following:
 1. Could public debt be constructed [sic] to fund an endowment contribution so long as earnings on the endowment were expended to acquire, construct, develop, extend, enlarge or improve land, waters, property, highways, buildings, equipment or facilities for public purposes?
 2. Could public debt be contracted to fund an endowment contribution if earnings on the endowment were returned to the state?
 3. Would expenditures made by the Great Lakes Protection Fund constitute the improvement of waters for public purposes? Specifically, (a) would an improvement to any of the Great Lakes, whether or not adjacent to the state, be a public purpose as regards the state, and (b) would expenditures of the nature permitted to be made by the Great Lakes Protection Fund constitute the improvement of waters? *Page 101 
 4. If some, but not all, of the permitted expenditures would qualify as the improvement of waters for public purposes, could public debt be contracted for the state's contribution to the Great Lakes Protection Fund so long as the fund agreed that earnings attributed to the state's contributions would only be spent for such improvements, even if earnings on other contributions were spent otherwise?
Because expenditures of the nature contemplated to be made by the Fund would not constitute the improvement of waters within the meaning of Wisconsin Constitution article VIII, section7(2)(a)1., the answer to question 3 (b) is no; the state cannot contract public debt to advance its contribution to the Fund. It is unnecessary, therefore, to answer your remaining questions.
In February 1988, the governors of Illinois, Michigan, Ohio and Wisconsin and the lieutenant governor of Minnesota executed a "Letter of Intent Relating to the Great Lakes Protection Fund." The letter contemplated the establishment of the Fund through the "Great Lakes Protection Fund Agreement," currently in draft form. The agreement creates the Great Lakes Protection Fund, a non-profit corporation, to:
 [A]dvance the principles, goals and objectives of the Great Lakes Toxic Substances Control Agreement and the Great Lakes Water Quality Agreement . . . by financing and supporting state and regional projects which:
 Accelerate the pace of research into the economic, environmental and human health effects of contamination of the Great Lakes;
Fund cooperative research and data collection;
 Develop improved methods of measuring water quality, and establish a firm scientific base for implementing a basin-wide system of water quality management for the Great Lakes; *Page 102 
Support research to improve the science on which protection policies are based and devise new and innovative cleanup techniques for particularly complex problems of toxic contaminants;
 Supplement, in a stable and predictable manner, state and federal commitments to Great Lakes water quality programs; and
 Nurture cooperation with, between and among leaders from state legislatures, local governments, business and industry, labor, universities, environmental organizations and conservation groups.
Under the proposed Articles of Incorporation of the Fund, the Fund would provide "grants to finance projects that advance the goals of the regional Great Lakes Toxic Substances Control Agreement and the binational Great Lakes Water Quality Agreement," two other multilateral compacts aimed at preserving and protecting the Great Lakes. Each Great Lakes state would be required to contribute a sum of money, as determined in the Articles of Incorporation. In the case of Wisconsin, that amount is $12 million. Under the corporation's articles, two-thirds of the earnings from the endowment would be used to finance project grants and one-third would be returned to the contributing states.
Under the proposed agreement, each state is free to designate a source for its required contribution. In Wisconsin, the Governor proposes to fund the state's contribution from the proceeds of general obligation bonds, in three installments of $4 million per year. General obligation bonds are "public debt," within the meaning of Wisconsin Constitution article VIII. Article VIII, section 7 (2)(a)1. of the Wisconsin Constitution authorizes the state to contract public debt "to acquire, construct, develop, extend, enlarge or improve land, waters, property, highways, buildings, equipment or facilities for public purposes." If not within this grant of authority, the proposed usage of public debt would violate article VIII, section 4 of the Wisconsin Constitution, *Page 103 
which provides: "The state shall never contract any public debt except in the cases and manner herein provided."
The word "improve," as used in the constitutional provision before me, has not been construed by the Wisconsin Supreme Court. The court has, however, accepted an ordinary dictionary definition of the term "improvement" as its legal meaning in other contexts. In Kallas Millwork Corp. v. Square D Co.,66 Wis.2d 382, 386, 225 N.W.2d 454 (1975), the court stated that an improvement is: "`a permanent addition to or betterment of real property that enhances its capital value and that involves the expenditure of labor or money and is designed to make the property more useful or valuable as distinguished from ordinary repairs.'" Accord United States Fire Ins. Co. v. E.D. Wesley Co.,105 Wis.2d 305, 309, 313 N.W.2d 833 (1982). The court of appeals has stated that improvements can include "remodeling" or "alterations." McQuay-Perfex, Inc. v. Wis. Tel. Co.,128 Wis.2d 231, 235, 381 N.W.2d 586 (Ct.App. 1985).
As proposed, grants from the Fund would be concerned with research projects. While the goal of the Fund would be to improve the quality of the Great Lakes in the sense that water quality would be bettered, improvements within the meaning of article VIII, section 7 (2)(a)1. of the Wisconsin Constitution are of a more specialized nature. Projects can entail remodeling and alterations but must accomplish more than mere repairs or, in the case of waters, restoration.
With respect to the internal improvements clause of the Wisconsin Constitution (article VIII, section 10), supreme court decisions suggest how the court would construe the term "improve" within article VIII, section 7 (2)(a)1.[1] In State ex rel. *Page 104 Jones v. Froehlich, 115 Wis. 32, 40, 91 N.W. 115 (1902), the court listed a number of projects which it considered to be improper internal improvements. In all cases, the projects involved public works — the construction of brick and mortar projects or, in the case of waters, the construction of dams, levies, wharves, dikes, etc. In Rippe v. Becker,56 Minn. 100, 57 N.W. 331 (1894), the court, in an opinion adopted by the Wisconsin Supreme Court in State ex rel. Owen v. Donald,160 Wis. 21, 79, 151 N.W. 331 (1915), said that "any structure" used by the state in the performance of a governmental function is not an internal improvement. This, of course, suggests that improvements must be physical structures.
More general authorities are in accord. In 78 Am. Jur. 2dWaters § 85 (1975), water improvements were defined as including "locks, dams, or levees, by the deepening of the bed or channel, or the removal of obstructions therefrom, or by straightening the channel or altering the course of the stream." This listing suggests that a water improvement must involve physical activity, not merely research projects and studies as contemplated by the proposed articles of the Fund.
While the word "improve" is not ambiguous, and so resort to the history of the provision is not appropriate, it is instructive to consider the drafting record of the constitutional amendment which gave rise to article VIII, section 7 (2)(a)1. of the Wisconsin Constitution. As originally proposed, 1967 Assembly Joint Resolution 1 would have permitted the issuance of public debt for "purchase and improvement of real property, for the construction and improvement of buildings, structures, improvements, facilities and highways." An informal opinion of the attorney general, included in the above-referenced drafting *Page 105 
record, stated that this language "would not permit borrowing for such things as pollution abatement studies, salaries, planning and the like." The opinion stated that the language would allow the construction of the pollution abatement facilities themselves.[2]
The drafting records contained in the Legislative Reference Bureau contain an April 19, 1967, letter from a Wisconsin law firm advocating the addition to the proposed constitutional amendment of the word "waters" in order to allow public debt to be used to finance an entire "water pollution program, not merely the physical aspects of it." This was in explicit response to the attorney general's opinion. This might be some authority for expansively construing the term "improve" to allow borrowing for, in the words of the attorney general, "such things as pollution abatement studies, salaries, planning and the like," but in context, I believe that the law firm's concern was with being able to use public debt to finance the various non-construction aspects of a pollution abatement program, such as planning costs, etc. There is no evidence that anyone intended that research, for example, not associated with a specific public works project was within the scope of permissible borrowing. In any event, there is no evidence that the Legislature redrafted the proposed amendment because of the concerns expressed in the law firm's letter and, therefore, as legislative history, the letter is of marginal significance.
There is direct evidence that the Legislature considered the public debt provision to authorize only capital projects. At the same time the constitution was amended to permit direct state borrowing, the constitution was amended to prohibit the use of the so-called "dummy building corporations" devices which the state had utilized in order to build state office buildings, *Page 106 
university structures, etc. In 56 Op. Att'y Gen. 286, 301 (1967), it was stated: "A reading of the entire [constitutional amendment] proposal indicates that the elimination of the dummy corporation method of financing is part and parcel of the proposed state bonding program." In fact, the referendum question put to the public asked whether direct state borrowing should replace use of the dummy building corporation.[3] This suggests that the intended scope of permissible borrowing was the same as the scope of the works of the building corporations, namely building.
To summarize, the state cannot contract public debt to finance its contribution to the Fund because the projects to be supported by the Fund would not constitute the improvement of waters pursuant to article VIII, section 7 (2)(a)1. of the Wisconsin Constitution.
DJH:ESM
[1] The court has applied the same definition of "debt" and "indebtedness" in different constitutional provisions, because "both deal with public debt and the underlying intent is the same." State ex rel La Follette v. Stitt, 114 Wis.2d 358,370-71, 338 N.W.2d 684 (1983). Since the terms "improve" and "improvements" are both contained in article VIII of the Wisconsin Constitution, I believe the court would define them the same way as well.
[2] In State ex rel. Hammermill Paper Co. v. La Plante, 58 Wis.2d 32, 76, 205 N.W.2d 784 (1973), the court held that pollution abatement facilities were "improvements" within the meaning of the internal improvements clause.
[3] The referendum question stated:
 "Shall section 7 of article VIII of the constitution be amended to permit the state to contract public debt, limited in amount, in order to acquire, construct, develop, extend, enlarge or improve land, waters, property, highways, buildings, equipment or facilities for public purposes, and eliminate reliance on the present method of financing such expenditures through leases with dummy building corporations? (NOTE: Adoption of this amendment would end the practice of borrowing through `dummy' building corporations which, as of 12/1/67, had an outstanding indebtedness of $382,511,869. Beginning 1/1/71 borrowing through state public building corporations would be unconstitutional, and all bonds issued for the state building program would be backed by the full faith and credit of the state.)".
1969 Jt. Res. 3, 1969 Laws of Wisconsin at 1518. *Page 107