The Honorable Walter Kunicki Co-Chairperson Joint Committee on Legislative Organization 212 North, State Capitol Madison, Wisconsin 53702
The Honorable Brian D. Rude Co-Chairperson Joint Committee on Legislative Organization 239 South, State Capitol Madison, Wisconsin 53702
Dear Representative Kunicki and Senator Rude:
You ask whether the state could use general obligation or revenue bonds to fund an expansion of the Petroleum Environmental Cleanup Fund Award (PECFA) program. PECFA is a state-operated program that reimburses owners for a portion of the cleanup costs of discharges from petroleum products storage systems and home heating oil systems. Sec. 101.143, Stats. Revenue for the program comes from a portion of the three cent per gallon petroleum inspection fee. Secs. 168.12(1) and 25.47, Stats.
PECFA provides reimbursement to tank owners or operators for the costs of cleaning up contamination and discharges from eligible petroleum product tank systems. PECFA provides awards for federally-regulated underground tanks that are equivalent to the federal financial responsibility requirements. It also provides awards for the costs of cleaning up contamination from above ground tanks and home heating oil tanks. Under the current law the maximum award for underground tanks is $500,000 or $1,000,000 (depending on the type and number of tanks owned by an owner) for costs incurred beginning August 1, 1987. Owners of above ground tanks may receive a maximum award of $190,000. Owners of home heating oil tanks can receive up to $7,500. Although the maximum award was originally scheduled to decrease to $190,000 on July 1, 1995, 1993 Wisconsin Act 16 (the 1993-94 biennial budget) changed the date to July 1, 1998. *Page 115 
That law also made provisions for denying eligibility under certain circumstances.
PECFA awards have grown from $312,000 in 1988-89 to a budgeted level of $75.5 million in 1994-95. In 1991 the Department of Industry, Labor and Human Relations (DILHR) and the Department of Natural Resources, the two departments responsible for administering the program, estimated that the total cost of the PECFA program would be approximately $935 million. As of November 30, 1993, DILHR has paid $124.3 million in PECFA claims.
The special PECFA study committee of the joint committee on finance is considering various changes in the PECFA program including the use of bonding to reduce an anticipated PECFA claim backlog in the late 1990's. Whether this use of the state's bonding authority is permissible involves analysis of three separate constitutional provisions. We must determine whether the PECFA program would be an authorized use of the state's bonding authority, whether such a use would violate the internal improvements clause and, finally, whether funding the program would violate the constitution's prohibition against lending the state's credit in aid of any individual, association or corporation.
 In determining the constitutionality of a legislative enactment, we begin with the well-established presumption of constitutionality that is generated by all legislative enactments. This court will find a legislative enactment unconstitutional only in the event that violation of a specific constitutional provision can be shown beyond a reasonable doubt, with all doubts to be resolved in favor of constitutionality. Moreover, the validity of the legislation in light of specific provisions of the constitution, rather than its wisdom, is the only concern of this court.
Wisconsin Solid Waste Recycling Auth. v. Earl, 70 Wis.2d 464,478 (1975). *Page 116 
CONSTITUTIONAL AUTHORIZATION
Article VIII, section 7(2)(a)1. of the Wisconsin Constitution authorizes the state to contract public debt "[t]o acquire, construct, develop, extend, enlarge or improve land, waters, property, highways, railways, buildings, equipment or facilities for public purposes." If the use of public debt does not fall within this grant of authority, it is prohibited under article VIII, section 4 of the Wisconsin Constitution which provides: "The state shall never contract any public debt except in the cases and manner herein provided."
The analysis of article VIII, section 7(2)(a)1. of the Wisconsin Constitution poses two questions. First, do the words "[t]o improve land, waters," etc. encompass the contemplated indebtedness in furtherance of PECFA? Second, would the contemplated indebtedness be "for public purposes" within the meaning of the debt authorization provision?
The Wisconsin Supreme Court has not construed the word "improve" in article VIII, section 7 of the Wisconsin Constitution. 78 Op. Att'y Gen. 100, 103-06 (1989) discussed the word "improve" and concluded that the word "improve" in article VIII, section 7 of the Wisconsin Constitution should be defined the same as the word "improvements" in article VIII, section 10
of the Wisconsin Constitution, the internal improvements clause. The effect of this conclusion was to restrict the borrowing authority under article VIII, section 7 of the Wisconsin Constitution, to the types of projects that have historically being considered to be works of internal improvements. The opinion went on to explain that works of internal improvements usually involve "physical structures." 78 Op. Att'y Gen. at 104.
The opinion also considered the significance of including the word "waters" in the borrowing authorization provisions of article VIII, section 7 of the Wisconsin Constitution. Although there were materials in the drafting records indicating that the word "waters" was included to make clear that public debt could be used to finance the entirety of water pollution programs, not just *Page 117 
their physical aspects, it was concluded that this evidence of legislative intent was of "marginal significance." 78 Op. Att'y Gen. at 105. I have reviewed the legislative history and related constitutional law and I am compelled to reach a different conclusion which supersedes 78 Op. Att'y Gen. 100 (1989) to the extent it is inconsistent.
Wisconsin Constitution article VIII, section 7, reads as follows in pertinent part:
 (2) Any other provision of this constitution to the contrary notwithstanding:
 (a) The state may contract public debt and pledges to the payment thereof its full faith, credit and taxing power:
 1. To acquire, construct, develop, extend, enlarge or improve land, waters, property, highways, railways, buildings, equipment or facilities for public purposes.
As discussed further below, this provision is relatively recent, having been approved by the electorate in April 1969.
As a general rule, the meaning of constitutional provisions is derived from the ordinary and common meaning of the words used to express them. This is considered especially appropriate for constitutional amendments since they are dependent on ratification by the people. Payne v. Racine, 217 Wis. 550, 555,259 N.W. 437 (1935). In the issue before us, the focus is on the words "[t]o . . . improve land, waters, [etc.] for public purposes." A dictionary contemporaneous with the adoption of the constitutional amendment provided the following definitions for the verb "to improve":
 1a: to make greater in amount or degree: INCREASE, AUGMENT, ENLARGE, INTENSIFY . . . 2a: to enhance in value or quality: make more profitable, excellent or desirable . . . 4a: to turn to profit or to good account: employ to good purpose: use to advantage. . . .
Webster's Third New International Dictionary (1968). *Page 118 
It is clear to me that the verb "to improve" applies to a broader range of activity than simply construction. And if the term "to improve" is limited to mean "to construct," then it is superfluous since the verb "to construct" is also expressly mentioned in the authorizing language of article VIII, section 7
of the Wisconsin Constitution. As stated long ago in Harringtonv. Smith, 28 Wis. 43, 67 (1871): "a statute ought, upon the whole, to be so construed that, if possible, no clause, sentence, or word, shall be superfluous, void or insignificant" and "every clause and word of a statute shall be presumed to have been intended to have some force and effect." The same principle applies to constitutional provisions. State ex rel. Williams v.Samuelson, 131 Wis. 499, 510, 111 N.W. 712 (1907).
Likewise, the full phrases "to improve land" and "to improve waters" would denote the same capacity "to raise to a better quality or condition" of the land or waters. Although there is a requirement that any such undertaking clearly improves the quality or condition of the land or waters, there is no imperative that physical structures be involved.
Contrary to the opinion in 78 Op. Att'y Gen. 100 (1989), I see no reason to encumber the debt authorization language of the 1969 constitutional amendment with the same meaning as the internal improvements clause in article VIII, section 10 of the Wisconsin Constitution. It is my opinion that the meaning of article VIII, section 7 of the Wisconsin Constitution, is most properly derived from its own terms and history and that the internal improvement clause continues on its own course as an independent constitutional limitation which needs to be addressed, but as a separate issue.
It is my opinion that the import of article VIII, section 7
of the Wisconsin Constitution is clear in evincing an intent to authorize the use of public debt to improve the conditions of land and waters without regard to whether the effort will involve physical structures. However, given that my predecessor arrived at a different conclusion, it would be fair to conclude that reasonable *Page 119 
persons may differ as to the constitutional intent and thus it is proper to look to the legislative history for enlightenment. State ex rel. Martin v. Heil, 242 Wis. 41, 55,7 N.W.2d 375 (1942).
Contrary to the treatment and conclusions in 78 Op. Att'y Gen. 100 (1989), it is my opinion that the "letter from a Wisconsin law firm" referred to at page 105 is, in context with the other information in the drafting file, very strong evidence of legislative intent to expand the constitutional debt authorization provision to include funding for counter-pollution measures beyond those involving only physical structures.
First, the letter is from a law firm known for its expertise and reputation as bond counsel, including years of providing bond counsel services to the state.
Second, as stated in 78 Op. Att'y Gen. at 105, the letter "was in explicit response to the attorney general's opinion" which was described as arising and advising as follows:
 As originally proposed, 1967 Assembly Joint Resolution 1 would have permitted the issuance of public debt for "purchase and improvement of real property, for the construction and improvement of buildings, structures, improvements, facilities and highways." An informal opinion of the attorney general, included in the above-referenced drafting record, stated that this language "would not permit borrowing for such things as pollution abatement studies, salaries, planning and the like." The opinion stated that the language would allow the construction of the pollution abatement facilities themselves.
78 Op. Att'y Gen. at 104-05. Clearly, the effort by the law firm was intended to change the situation.
Third, the letter has additional significance because it is addressed to the Speaker of the Assembly and states prefatorily that it is accompanied by a revised draft of Assembly Joint Resolution No. 1 "to implement the suggestions made at the meeting in Madison with certain legislative leaders on April 10." *Page 120 
According to the "cc:," copies were provided to lists of legislative leaders.
In order of presentation in the letter, the primary revision was to add the word "waters" to the proposed constitutional amendment. According to the letter: "This change was made in order to obviate any possibility that the amendment would not permit financing by state debt of a water pollution program . . . . [I]t would permit the state to incur debt to finance the whole of such a program and not merely the physical aspects of it." Note that it was the draft proposals offered by the law firm that took the approach of using the verb "to improve" instead of the "improvement" terminology used in 1967 Assembly Joint Resolution 1.
The conclusion in the 1989 opinion that the letter is of marginal significance because there is no linkage with legislative redrafting is clearly mistaken. On the top of the letter are handwritten the following:
"Drafting request" "4/20/67 "4312"
 Sub to Sub in compliance with this letter GK Anderson"
"Sub to Sub" apparently means this is a substitute for an earlier draft substitute amendment to Assembly Joint Resolution 1. The number "4312" is a Legislative Reference Bureau drafting number written on the front of the firm's letter. Legislative Reference Bureau number 4312 was in fact introduced as Assembly Substitute Amendment 1, to Assembly Joint Resolution 1 on April 27, 1967, by Assemblyman G.K. Anderson. It was the version adopted by the legislature in two consecutive sessions and approved by the voters on April 27, 1969.
In light of this legislative history, it is my opinion that the legislature did intend to adopt and submit to the people a constitutional amendment that would enable the state to use public debt to fund the entirety of water and land pollution *Page 121 
abatement programs, not just the physical aspects of these programs. Based on the natural and popular meaning of the terminology used, it is my opinion that this too is what the people approved at the referendum.
As to the PECFA program, I conclude that the cleanup of petroleum products in the ground and contaminating or threatening our waters would qualify as a program "to improve land [or] waters" within the meaning of the constitutional debt authorization provision.
The second issue under the terms of article VIII, section 7
of the Wisconsin Constitution, is whether the proposed indebtedness is "for public purposes."
 [I]t should be recognized that the Public Purpose Doctrine is not a static doctrine; it evolves to meet the needs of the public. The supreme court has recognized that "[t]he trend of both legislative enactments and judicial decisions is to extend the concept of public purposes . . . ." Hammermill, 58 Wis.2d at 55. Moreover, the court has stated that "the legislature is not restricted to the concept of public purpose as it had been understood in years gone by." State ex rel. Bowman v. Barczak, 34 Wis.2d 57, 64, 148 N.W.2d 683 (1967).
74 Op. Att'y Gen. 26, 31 (1985).
Although there can be little doubt that counter-pollution programs are in general "for public purposes," the question lingers in this case because the mechanics of the contemplated PECFA program would have the state funds going to private individuals to reimburse them for cleanup projects conducted on their own property.
In State ex rel. Warren v. Nusbaum, 59 Wis.2d 391,208 N.W.2d 780 (1973), the court found that legislation creating a housing authority which would make loans to private developers at reduced rates to promote low and moderate income housing served a public purpose even though it obviously benefited private individuals. The court explained: *Page 122 
 In the instant case, whatever benefit is derived by private individuals and specific localities is necessary and incidental to the promotion of public health, safety, education, morals, welfare and comfort of the people of this state. The advantage to the public of increasing the supply of adequate housing and eliminating the by-products of substandard housing is direct and not indirect and remote.
Warren v. Nusbaum, 59 Wis.2d at 423.
In my opinion, the abatement and prevention of petroleum pollution which is the purpose of PECFA would promote "public health, safety, education, morals, welfare and comfort of the people of this state" as much if not more than the housing subsidy at issue in Warren v. Nusbaum. It seems to me short-sighted to look only at the fact that the program would help current property owners remediate existing petroleum pollution problems. In many cases, we can assume that the pollution problems go back many years, perhaps generations, to times when our environment was less understood. Furthermore, the threat posed will only increase with the passage of time, especially as underground storage tanks deteriorate. The essential character of the PECFA program is to mitigate now and for the future the environmental threats caused by unfortunate practices of the past. That we as a society should take responsibility to fix this situation now is in my opinion clearly an undertaking for public purposes.
There may be concerns in some quarters regarding the use of public debt to finance pollution cleanup or other projects intended to improve the quality of our land or waters, because public debt has historically been associated with physical structures that have a long-term useful life. The policy and historical rationale is that it is proper to spread the cost over the useful life of the structure. The Appraisal of Municipal CreditRisk (1979) at 195; 1991 Wis. L. R. 1301, 1367. A special facet *Page 123 
of the policy is the notion of intergenerational equity which is concerned with the fairness of incurring debt in the present and leaving the payments to taxpayers in the future. See,Public Finance in Theory and Practice (2nd ed. 1976) at 603. Under this rationale it seems perfectly appropriate to finance counter-pollution efforts with public debt, because we have come to learn that the quality of our environment is a concern of enormous magnitude which will outlast mere "bricks and mortar."
INTERNAL IMPROVEMENTS CLAUSE
Article VIII, section 10 of the Wisconsin Constitution provides that unless specifically authorized "the state may never contract debt for works of internal improvement, or be a party in carrying on such works." Just as I concluded above that the meaning of the "to improve" phraseology in the debt authorization provisions in article VIII, section 7 of the Wisconsin Constitution, is not encumbered with the meaning of the internal improvements clause, it is my opinion that the meaning of the internal improvements clause is unaffected by the meaning of the debt authorization clause. The internal improvements clause has historically been construed to be a limitation on state involvement in the construction of physical structures. 78 Op. Att'y Gen. at 104.
It is my understanding that PECFA would not involve the construction of physical structures and therefore could not run afoul of the internal improvements clause.
Even if the internal improvements clause were implicated, it is probable that the "governmental function" exception would apply. In State ex rel. La Follette v. Reuter, 33 Wis.2d 384,403, 147 N.W.2d 304 (1967), the court held as follows: "We conclude that matters pertaining to the abatement of water pollution are governmental functions of the state of Wisconsin and that water pollution prevention and abatement facilities are not works of internal improvement within the prohibition of sec. 10, art. VIII, Const." *Page 124 
Therefore, it is my opinion that it is within the constitutional power of the legislature to use public indebtedness to finance the PECFA pollution abatement program. More information will be needed to determine whether revenue bonding as well as general obligation bonding will be available. If revenue bonding is used, we recommend that be made clear in the legislation.
LENDING OF CREDIT
Under article VIII, section 3 of the Wisconsin Constitution, the credit of the state cannot be given or loaned in aid of any individual association or corporation. Because the proceeds of the bonds would not be used to assure the performance of private entities and their obligations, there would be no lending of credit in violation of that provision of the constitution. SeeState ex. rel. Wisconsin Dev. Authority v. Dammann, 228 Wis. 147,197, 277 N.W. 278, 280 N.W. 698 (1938).
In conclusion and in light of the fact that legislation is still at the formative stage, I return to the presumption in favor of constitutionality. Although there is a general favorable presumption, there is a historical undercurrent against legislative debt. 1991 Wis. L. Rev. 1301. In the end, the courts play a very significant role in determining what debt will be sustained. 1991 Wis. L. Rev. at 1340. In applying the presumption, it is very important to have the benefit of full and clear statements by the legislature describing the problems to be addressed and the reasons for the approach chosen. See, WisconsinSolid Waste Recycling Auth., 70 Wis.2d at 493 and Warren v.Nusbam [Nusbaum], 59 Wis.2d at 434. Therefore, if legislation is drafted to use bond financing to support PECFA, I strongly recommend that the legislation clearly set out the specific reasons for PECFA and the specific reasons why bond financing is deemed an appropriate method of financing for the program. I must also caution that this opinion is limited to the single question of the use of bonding to finance the PECFA pollution abatement program. The propriety *Page 125 
of the use of bonding for any other endeavor must be considered on a case-by-case basis.
Sincerely,
 James E. Doyle Attorney General
JED:RWL:vmz *Page 126